**W. W. BLACKBURN and Jerry Blackburn, Individually and d/b/a Tiny Blackburn Agency, Plaintiffs-Appellants,**

v.

**CRUM & FORSTER et al., Defendants-Appellees.**

No. 79–1648.

United States Court of Appeals, Fifth Circuit.

Feb. 1, 1980.

Rehearing Denied March 6, 1980.

---

John Wright & Associates, John Wright, George McCall, Grand Prairie, Tex., for plaintiffs-appellants.

Strasburger & Price, Ernest R. Higginbotham, Mark Martin, Dallas, Tex., for defendants-appellees.

Before GOLDBERG, FAY and ANDERSON, Circuit Judges.

FAY, Circuit Judge:

Appellant insurance agents, W. W. Blackburn and Jerry Blackburn, challenge an adverse summary judgment in their suit charging the insurer appellees with a concerted refusal to deal violative of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976).[1] We agree with the trial judge that the record evidence, garnered in nearly two years of discovery and presented at the summary judgment hearing, utterly fails to establish the rudimentary elements of an unlawful group boycott. Overcoming a conceded judicial reluctance to approve summary disposition of antitrust actions, we affirm the judgment of the district court.

From April, 1970, to April, 1976, the Blackburns were independent insurance agents for appellee insurance companies. The insurers, affiliated through their common holding company and co-appellee Crum & Forster, refused to sell insurance through the Blackburns after a serious business dispute between appellee North River Insurance Company and the agents. Additionally, appellee U.S. Fire Insurance Company, also part of Crum & Forster's holdings, refused to provide the Blackburns with Er-

rors and Omissions insurance, which protects insurance agents from liability to insureds for mistakes and unwarranted delay in issuing policies. Because the Blackburns' agency contract was cancelled for fraud, other insurance companies were reluctant to use them as their agents. Eventually, the Blackburns sold their deteriorating business.

The rift in the parties' previously amicable business relationship occurred when a warehouse burned while its insurance coverage was being transferred from a competing insurer, The Hartford Company, to the appellee insurer North River Insurance Company. North River claimed that without any prior authority the agents issued an insurance policy shortly after the warehouse burned. Asserting that it never received from the agents any verbal or written request for coverage, North River refused to pay the claim and cancelled the agency contract, alleging fraud. The Blackburns, however, argued that North River had given verbal permission to issue a policy, with protection effective from November 1, 1975. They further claimed that they issued a binder[2] and mailed copies to North River, destroying their own copies of the binder when they issued the policy, as was customary. Thus, the Blackburns had no tangible evidence of the verbal permission which North River claimed never to have granted.

From this legitimate business conflict[3] spring the Blackburns' antitrust charges. The Blackburns believed that the root of the insurers' discontent was not the alleged fraud, but rather the diminishing proportion of the agents' insurance business that

---

1. During oral argument appellants' counsel conceded that 15 U.S.C. § 2 (1976) has no place in this litigation, although monopolization attempts violative of § 2 had been alleged. As pertinent to this appeal, 15 U.S.C. § 1 (1976) provides:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

2. An insurance binder is a memorandum of the insurance coverage agreement. It extends protection to the insured pending issuance of the policy, while the insurer is investigating the risks and setting appropriate premium rates. *See* Black's Law Dictionary 213 (4th ed. 1957).

3. Litigation of the contractual dispute is pending in the Texas courts. We express no opinion regarding the merits of those separate issues.

the insurers had been enjoying. According to the Blackburns, the insurers terminated the agency contract and cancelled the Errors and Omissions policy not only to prevent the agents from serving other insurance companies but also to make an example of the Blackburns that would deter other independent agents from serving the insurers' competitors. Consequently, the Blackburns filed suit, alleging an illegal group boycott by Crum & Forster and its insurance companies. They appeal from summary judgment for the insurers.

■ Although the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015 (1976), exempts the insurance industry from the antitrust laws, section 3(b) of the Act, *id.* § 1013(b), re-erects against insurance companies the antitrust barriers to anticompetitive group boycotts.[4] *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 541, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). To ascertain whether the insurers in this case transgressed those strictures, we initially consider whether their conduct is per se illegal. We review the record evidence in the light most favorable to the appellant agents. *See Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83, 85 (5th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). Clearly, related insurance companies and their holding company could wage an unlawful group boycott. *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (holding that common ownership of separate corporations does not preclude suit under the antitrust laws); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 34 n.49 (5th Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (similar).

It is true that certain Supreme Court boycott cases can be read broadly to require the application of the per se rule to all explicit concerted refusals to deal. *See, e. g., Silver v. New York Stock Exchange,* 373

U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Klor's Inc. v. Broaway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Such an expansive reading may truly be proper in cases like those before the Supreme Court in which the plaintiff, the excluded party, is on the same competitive level with one member of the conspiracy. In other words, in such cases it may be proper to infer anti-competitive motive and effect because the conspiracy has a horizontal aspect.

■ This case, however, provides a sharp contrast. All members of the supposed conspiracy are suppliers of insurance. None competes with the plaintiff, an insurance broker. Accordingly, this case contains no horizontal aspect, but involves only a vertical action undertaken by suppliers, the insurance company defendants, against their agent, the insurance broker plaintiff. The per se rule is therefore inapplicable, and the plaintiff must prove that the defendants acted with an anticompetitive motive. *See, e. g., Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 168 (3d Cir. 1979); *Marquis v. Chrysler Corp.,* 577 F.2d 624, 640 (9th Cir. 1978); *Southern Distributing Co., Inc. v. Southdown, Inc.,* 574 F.2d 824 (5th Cir. 1978); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). The Blackburns' evidence, however, yields inadequate proof of the insurers' intentional attempts to circumscribe competition among independent insurance agents or among its competitors. *See E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d at 187. After nearly two years of discovery, the Blackburns produced no more than their own uncorroborated allegations that the insurers cooperated either to punish the Blackburns for serving other insurance companies or to make an example of the agents that would deter other independent agents from serving the insurors' com-

---

4. 15 U.S.C. § 1013(b) provides:

Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

petitors. Moreover, evidence of the parties' legitimate business dispute defeats the charge of anticompetitive animus. Absent some malevolent intent, the insurers' conduct cannot be labelled per se illegal. *See id.*

■ Having cleared the first hurdle of the antitrust barriers, the insurers' refusal to deal next must pass muster under the rule of reason. *See id.* at 185, 188. Again we find nothing in the record to indicate an unreasonable restraint of trade. The insurers chose to sever their relationship with agents whose actions they deemed fraudulent. The decision by U. S. Fire Insurance Company to terminate the Errors and Omissions policy denotes only the company's resolution not to protect agents whose alleged faulty records or fraudulent proclivities would subject the insurer to frequent claims or litigation. We need not resolve the contractual controversy to perceive that such a dispute would permit reasonable insurers to terminate a relationship with their agents.

We acknowledge that the events surrounding the parties' dispute engender many issues of material fact. Resolution of those issues, however, is not for a federal forum. Notwithstanding the rule circumscribing summary disposition of antitrust cases, the trial court's ruling in this case accurately reflects the paucity of "significant probative evidence" bolstering the agents' allegation of illegal group boycott. *See Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1110–12 (5th Cir. 1979); *Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389, 393–94 (5th Cir. 1976). Accordingly, that judgment is AFFIRMED.