LANGSTON CORPORATION

v.

STANDARD REGISTER COMPANY, et al.

Civ. A. No. C82–1204.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 30, 1982.

George Grant Crooks, Charles R. Desiderio, Atlanta, Ga., for plaintiff; Ruby Carpio Bell, Atlanta, Ga., of counsel.

Jefferson D. Kirby, III, Ford, Harrison, Sullivan, Lowry & Sykes, Atlanta, Ga., Nicholas C. Hollenkamp, Turner, Granzow & Hollenkamp, Dayton, Ohio, for Standard Register Co.

Susan A. Cahoon, Kilpatrick & Cody, Atlanta, Ga., Lyle Gritchen, Jack A. Rovner, G. Christian Kronberg, Kent A. Zigterman, Martin L. Lagod, Kirkland & Ellis, Chicago, Ill., for Voluntary Hospitals of America, Inc.

John K. Train, III, Martin J. Elgison, Alston, Miller & Gaines, Atlanta, Ga., Walter C. Greenough, Susan Lichtenstein, William A. Montgomery, Schiff, Hardin & Waite, Chicago, Ill., for UARCO, Inc.

Douglas F. Dent, Greenville, S.C., for John Q. Zeisler.

George W. Armbrister, Jr., Atlanta, Ga., for Fred W. Smithwick, Jr.

## ORDER

ORINDA D. EVANS, District Judge.

This case is before the Court on Plaintiff's Motion for a Preliminary Injunction.

Plaintiff brought this action under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiff moved for a preliminary injunction to enjoin Defendants' alleged group boycott and the case came on for hearing on September 16, 17, and 20, 1982. At the close of Plaintiff's evidence, Defendants moved to deny the request for a preliminary injunction on the ground that Plaintiff failed to present evidence showing entitlement to such relief. For the reasons discussed herein, Defendants' Motion is GRANTED and Plaintiff's Motion for a Preliminary Injunction is DENIED.

In synopsis, this case involves group purchasing agreements negotiated on behalf of independent non-profit hospitals across the country to supply the hospitals with certain standard and customized business forms. Standard forms in the hospital industry include stock computer paper, labels, business envelopes, x-ray envelopes, cut sheets, medical records file folders, and plastic identification cards. These items are sometimes referred to as "generic," stock or commodity items and are in common use by all hospitals. Custom forms are multi-part or continuous printed forms tailored to the precise medical or business record-keeping needs of particular hospitals.

Plaintiff Langston Corporation had an agreement with the hospitals whereby it was designated as the sole recommended broker for generic forms but the agreement was terminated over Plaintiff's objection in April 1982. Defendant Standard Register Company was and is under contract as the sole recommended supplier of custom forms. Langston alleges that the termination of its agreement and the hospitals' contract with Standard Register are designed to prevent Langston from competing in the markets for generic or custom forms, and amounts to a classic group boycott and a *per se* violation of the federal antitrust laws.[1]

## I. *The Parties*

Defendant Voluntary Hospitals of America, Inc. (VHA), an Illinois corporation, is a cooperative of approximately 30 non-profit hospitals, each of which owns one share in VHA. VHA itself is a for-profit corporation. Its board of directors is comprised of executives from the various member hospitals. VHA was founded in 1977 for the stated purposes of providing member hospitals with management services, political strength in the health care industry, cost containment efforts and economies of scale.

VHA negotiates group purchasing agreements with suppliers on behalf of member hospitals. Member hospitals are then offered an opportunity to participate. Under VHA's by-laws, VHA can only recommend a supplier to member hospitals and cannot obligate them to join in the group buying plan. In practice, however, member hospitals do participate rather consistently.

Defendant Standard Register Company (Standard Register), an Ohio corporation, is one of the nation's largest manufacturers and sellers of business forms. It manufactures primarily custom forms and certain generic items, and also brokers but does not manufacture a variety of other stock items. Standard Register is the recommended source of supply for custom forms to VHA member hospitals under the group purchasing agreement at issue in this case.

Plaintiff Langston Corporation (Langston), a Georgia corporation, is essentially a one-man broker of generic forms. Langston was the recommended broker of generic forms to VHA member hospitals from about May 1979 until VHA terminated the agreement in April 1982.

Defendant Uarco, Inc. (UARCO), an Illinois corporation, is, like Standard Register, a large manufacturer and supplier of custom business forms. Langston and UARCO had an agreement to jointly attempt to market custom forms to VHA hospitals

---

1. It is not clear, even after three days of hearings, whether Plaintiff alleges (1) the VHA-Standard Register agreement was a boycott of Langston with respect to the custom forms market; or (2) VHA's termination of Langston as recommended broker of generic forms amounts to a boycott with respect to the generic market; or (3) both.

from December 1981 until UARCO cancelled the agreement in April 1982.

## II. *Facts*

The following facts were shown by the evidence introduced at the hearing: In late 1977 the VHA board of directors designated Fred Smithwick, financial vice president of VHA member Riverside Methodist Hospital in Columbus, Ohio, to develop a program to save VHA hospitals money on custom business forms. Smithwick took the idea to John Zeisler, the Standard Register sales representative at Riverside, and the two developed the VHA "Forms Management Program." The proposal was to select a single source custom forms manufacturer and then to standardize form sizes within and among member hospitals to achieve larger printing press runs, volume discounts and economies of scale. The VHA board adopted the proposal at Smithwick's urging.

VHA and Standard Register, through Zeisler, entered into a letter of agreement in December 1977 whereby Standard Register became VHA's prime vendor of custom forms, and a recommended source of certain generic forms as well. Standard Register agreed to sell the forms to VHA hospitals at 10 percent off "list price" and to pay a further two percent rebate on group purchases.[2] The agreement did not require VHA hospitals to purchase all or indeed any of their custom forms requirements from Standard Register, and there was no minimum volume requirement in order for purchasers to reap the benefits of the agreement. Most member hospitals decided to participate fully. Smithwick was in charge of the Forms Management Program for VHA and Zeisler became the VHA national account manager for Standard Register.

In August 1978, Zeisler, with Smithwick's advice and financial aid,[3] formed the Langston Corporation. Zeisler resigned from Standard Register in May 1979 and VHA retained Langston[4] as a consultant to the Forms Management Program at a salary of $50,000 a year. Langston's stated role was to serve as consultant to VHA and to monitor the 1977 agreement with Standard Register. However, VHA also appointed Langston as a recommended broker for generic forms, some of which Standard Register had been providing under its contract.

In the fall of 1979, Langston, acting at the behest of VHA, renegotiated the Standard Register-VHA contract which was about to expire. The negotiations yielded a new three-year contract between Standard Register and VHA[5] with the same 10% discount off Standard Register's list price, but a higher (3%) rebate. Like the previous contract, this contract did not require that the VHA hospitals purchase a particular volume of forms in order to qualify for the discount on the rebate. However, the new contract limited Standard Register's recommended status to seller of only those cus-

2. Rebates negotiated under the agreements were paid by Standard Register to participating hospitals. The hospitals paid the rebates into a "patronage pool," from which VHA deducted its costs of administering the agreement. The balance was be paid back to the participating hospitals in the form of "patronage dividends" commensurate with the level of their purchases.

3. The relationship between Zeisler, his company and Smithwick was, to say the least, cozy. Smithwick loaned Zeisler $6,000 to form Langston and Zeisler later transferred one half of the outstanding Langston stock to Smithwick.

In 1980, while Smithwick was in charge of the forms program, and while the forms program paid Langston as a consultant, Smithwick became a paid consultant to Langston at about $6,000 per month, plus additional fees for special projects.

Langston paid Smithwick, and VHA paid Langston, as the VHA executives considered Langston's and Smithwick's proposals regarding their roles in a reorganized forms programs. It is not clear whether or not the top VHA executives were aware of the symbiotic relationship between Zeisler and Smithwick. But VHA's documentary evidence at the hearing shows that at least 40 percent of Smithwick's 1981 income came from Langston.

Finally, Smithwick's duties as forms consultant included monitoring Langston as VHA's recommended source of generic forms.

4. Langston and Zeisler are one and the same. The Court will refer to Langston, the named Plaintiff in this lawsuit, for the sake of clarity.

5. The actual agreement was between Standard Register and Langston, with VHA as the beneficiary.

tom forms manufactured by Standard Register.

Between the fall of 1979 and the fall of 1980, Standard Register was the recommended vendor for custom forms (at least, those forms manufactured by it) and Langston was the recommended broker for generic forms. Also, Langston was overseeing the VHA forms program (presumably as to both custom and generic forms) to effect cost savings to VHA member hospitals. However, in the fall of 1980, Zeisler's friend Smithwick resigned as executive in charge of the VHA forms program. Subsequent discussions between VHA and Zeisler regarding Langston's apparent role conflict ensued and resulted in Langston's withdrawing as consultant to VHA.[6]

On August 1, 1981, VHA and Langston reduced to writing an agreement on Langston's role as generic forms broker.[7] The agreement stated that the "recommended product line will consist initially of *but not limited to* specialty labels, business envelopes, and plastic cards."[8] (emphasis added). The words "but not limited to" were not in the original agreement but were hand written and inserted at Langston's request. Langston had developed a "working relationship" with Moore Business Forms, a custom manufacturer, and apparently expected that language to allow it to approach member hospitals as a VHA-recommended source of custom forms as well as generic forms.[9] Langston's relationship with Moore Business Forms collapsed and Langston entered an agreement with UARCO in December 1981 to attempt to market custom forms to VHA hospitals.

Langston then began to represent itself to member hospitals as a recommended source of custom forms. Despite explicit instructions from VHA forms program director William Baiocchi in December 1981 and January 1982 that Langston's recommended status extended only to generic forms, Langston did not inform VHA that it had already contacted member hospitals.[10] When VHA learned of Langston's activities from hospital purchasing agents, VHA executive director Robert Kitzman announced at a January 1982 purchasing agents conference that Langston was not recommended for custom forms.

After further investigation VHA concluded that Langston's efforts were a breach of its agreement and terminated Langston as a recommended generic broker effective April 1982. UARCO also cancelled its agreement with Langston in April 1982. Although Langston is no longer a recommended source for generic forms, a few VHA hospitals continue to buy them from Langston. Most, however, do not. Since the VHA hospitals were virtually Langston's only customers, this situation has dramatically reduced Langston's sales. In 1981 its sales were as much as $90,000 per month; now they are $2,000–$3,000 per month.

Langston initiated this action in June 1982. It seeks an order enjoining VHA and

---

**6.** In addition, VHA determined that because Langston was no longer consultant, VHA should be substituted for Langston as the contracting party in the 1979 agreement with Standard Register. This change occurred in September 1981; the contract otherwise remained the same.

**7.** The contract term extended until December 31, 1982.

**8.** These are generic items and were among those specifically excluded from the 1979 Standard Register contract.

**9.** Zeisler testified on cross-examination that Langston was having trouble competing in a highly competitive and price-cutting market for generic forms. He hoped to enter what he perceived to be the more lucrative custom forms market.

**10.** Defendant VHA did not put on any direct evidence of its understanding of the contract with Langston. From depositions admitted into evidence and from Zeisler's admissions on cross-examination it is clear that VHA understood the words "but not limited to" to allow Langston to market at a future time generic forms in addition to those listed in the contract, but not to be a recommended source for custom forms. (Trial Transcript p. 249; Arnwine Dep., Vol. II, pp. 69–70; Kitzman Dep., Vol. I, pp. 52–54; Traubridge Dep., p. 33). VHA intended that there be only one recommended custom source, and Standard Register was it.

its members "from refusing to deal with Plaintiff with the same historical frequency of purchases and in historical amounts and for the same prices and on the same terms and conditions as existed prior to January 1, 1982." It also seeks an order enjoining the VHA hospitals "from refusing to accept competitive bids from Plaintiff," and "from recommending any source of supply of forms to any hospital."

### III. *Discussion*

In order to prevail on this motion for a preliminary injunction, Plaintiff must demonstrate (1) a substantial likelihood of prevailing on the merits of the claim at trial; (2) a substantial danger of irreparable injury if the injunction is not granted; (3) that Plaintiff's threatened injury outweighs the harm the injunction may do to Defendants; and (4) that granting the injunction will not disserve the public interest. *Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir.1975).[11] A preliminary injunction is an extraordinary remedy and will not be granted "unless the plaintiff carries his burden as to all of the four prerequisites." *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185, 186 (5th Cir.1982).

■ Initially, the Court rejects out of hand Plaintiff's request for injunctive relief which would require VHA to use Plaintiff as its recommended forms broker. Even if violation of the antitrust laws were shown, this relief would not serve any interest protected by such laws. Antitrust laws are not intended to serve as a foil against competitors; they are calculated to serve the interests of the public in free competition. While it is true that granting injunctive relief to one competitor against another may also serve the public interest, no reason at all has been shown the Court as to why this would be the case if Langston, rather than any other company, were appointed as recommended forms broker for VHA.

This leaves, however, Langston's other requests for injunctive relief. It wants the Court to require VHA to accept competitive bids for forms, and to stop using its present system of contracting with one company as the recommended source of supply of forms for all VHA member hospitals. Plaintiff alleges that VHA and Standard Register conspired, in the form of a classic group boycott, to exclude Langston from competing in the custom forms market by agreeing that Standard Register would be a sole recommended source for such forms. Langston also alleges that VHA's termination of Langston as recommended broker of generic forms was in some fashion a part of the group boycott. It further alleges that UARCO joined the boycott by cancelling its marketing agreement with Langston.

Other than the evidence at the hearing reflecting the precipitous drop in Langston's sales after its termination as VHA's broker in the spring of 1982, Langston adduced no evidence of claimed ill effect of Defendants' conduct. No evidence was adduced as to its impact, if any, on any market. In fact, the Court is not certain what Plaintiff considers the relevant market to be. Its brief filed in support of its motion for a preliminary injunction (Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction, filed June 9, 1982) suggests that there is adverse effect on the patients the hospitals serve, to wit, that the cost of the forms (which presumably is passed along to patients) is higher under the VHA-Standard Register group purchasing arrangement than it would be if the forms contracts were put out to competitive bid.[12] However, Plaintiff has not adduced a whit of evidence to support this theory.

11. Cases decided by the Former Fifth Circuit Court of Appeals before October 1, 1981 are the law of the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

12. It is not clear what Plaintiff means by "competitive bid." Standard Register's present three year contract was entered into after VHA (through Langston, in fact) had investigated various alternatives. Thus, it may be argued that competition did play a role in the awarding of one contract. On the other hand, it is not clear that the Standard Register-VHA agreement commits Standard Register to sell forms at a fixed or pre-formulated price during the term of the agreement. The agreement says forms will be sold at 10% below Standard

Plaintiff contends nonetheless that it is entitled to an injunction. It contends the above described alleged conspiracy constitutes a classic group boycott which is a *per se* violation of Section 1 of the Sherman Act. If so, Plaintiff is correct that it need not introduce evidence of anticompetitive effect to obtain injunctive relief. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

Courts early developed the rule of *per se* illegality to deal with those

> agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Conventional group boycotts fall into this *per se* category. In a conventional boycott, actors at one level in the chain of distribution seek to exclude competitors or those who seek to compete by concerted action to deprive them of some trade relationship which they need to compete effectively. *Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485 (5th Cir.1982).

Typically, a group of competitors will band together and request a boycott by a supplier of a target competitor. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). They may bring economic pressure on the supplier, by threatening to withhold their patronage, to induce the supplier to cut off the target. *Fashion Originators' Guild of America v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail*

*Lumber Dealers Assoc. v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). The classic boycott usually involves a plurality of actors at the targeted levels. But a *per se* violation can occur with only one participant at the target's level. In *Klor's, Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the Court found an illegal boycott when a single retailer used its purchasing power to induce manufacturers and wholesalers to sell only at discriminatory prices to a competing retailer. It held that summary judgment for defendant was improper even though no proof had been shown of any harm to consumers. The decision stressed the pernicious quality of the boycott, which by its very nature had monopolistic effect, albeit a limited monopolistic effect.

Group boycotts, like many other trade practices involving concerted action, have both "vertical" and "horizontal" characteristics. They involve relationships between parties at different distributive levels that may affect relations between parties at the same level. But it is the pernicious horizontal thrust of the activity—the effort by a conspirator or conspirators to exclude or coerce the trade practices of competitors—that condemns boycotts to *per se* prohibition. *Blackburn v. Crum & Forster,* 611 F.2d 102, 104 (5th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980). The *per se* rule, then, is a narrow one, *see Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and should be invoked only when a trade practice is so clearly anticompetitive as to foreclose further inquiry.[13] As Professor Sullivan has stated:

Register's "list price"; however, "list price" is not a defined term in the agreement. No evidence was introduced to clarify this point, however.

**13.** There are many common trade practices involving concerted refusals to deal with some third party with purposes and effects quite different from a classic boycott. Requirement contracts, exclusive dealing contracts and contracts involving exclusive territories involve

limitations on the freedom of one or more parties to do business with others. But

> in the ordinary case these do not involve combining for the primary purpose of coercing or excluding ... and .... the issue in these cases is ... whether the purpose and effect of the operation was such as unreasonably to exclude outsiders from participation in the trade in question. The principle of the group boycott cases—that it is prima facie

If the *per se* rule respecting boycotts is to become coherent, we must recognize that it applies only where competitors engage together to inhibit others with whom they compete by depriving those others of elements needed in the competitive context. This is not to say that other concerted refusals may not be illegal [under a rule of reason analysis]; many will be, some of them plainly so. It is only to insist that we look at the others, each for what it is, and do not suppose that as some distant relative of the classic boycott it must be cursed with the same baleful characteristics.

L. Sullivan, Handbook of the Law of Antitrust 259 (1977).

■ This case has not been shown to involve a *per se* violation of the antitrust laws. The VHA Forms Management Program amounts to a group purchasing agreement, and the decision of the group to recommend one supplier over another is not *per se* illegal. *See Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Cos.,* 682 F.2d 660 (7th Cir.1982); *Blackburn v. Crum & Forster,* 611 F.2d 102 (5th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980); *Ackerman-Chillingworth v. Pacific Electrical Contractors Assoc.,* 579 F.2d 484 (9th Cir. 1978), *cert. denied,* 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *Webster County Memorial Hospital, Inc. v. United Mine Workers of America Welfare & Retirement Fund,* 536 F.2d 419 (D.C.Cir.1976).

The Court is not prepared to hold that a group purchasing arrangement could never constitute a *per se* violation. However, per *Klor's* and *Northern Pacific, supra,* the question is whether the conduct of the boycotting parties is so pernicious in nature that it may be presumed illegal. In the *Klor's* case, there was no possible redeeming benefit to the public in defendant's arranging with wholesalers to sell appliances to defendant's competitor only at artificially high prices. Taken at face value, the arrangement appeared to involve a direct attempt to harm the competitor, with no benefit to anyone except the defendant whose position would thereby be incidentally enhanced vis-a-vis that of the competitor.

The Standard Register-VHA arrangement in the instant case is different on its face. There is nothing inherently wrong with Standard Register's seeking to persuade VHA to buy from it instead of from Langston.[14] Standard Register is the direct beneficiary of this arrangement; any harm to its competitor is merely incidental. Neither is VHA's decision to terminate Langston facially suspect in light of the history of their relationship. Furthermore, a group purchasing arrangement is a conventional means of reducing costs to participating members. Therefore, the Court will not presume anticompetitive motives on the part of Standard Register or VHA in entering into the agreement.

Nor will the Court presume that the Standard Register-VHA agreement is not cost efficient, or accept Plaintiff's merely conclusory assertions to that effect. The Court is well aware that the health care industry generally has been criticized for lack of competitive incentives. This is said to be a function of the fact that patients do not make direct payment for medical and hospital bills. However, this does not relieve Plaintiff of the obligation to show the Court precisely why the Standard Register-VHA contract is anticompetitive, if such be the case.

■ Langston urges alternatively that Standard Register was the source of horizontal pressure to exclude Langston as a competitor. This theory is that Standard Register was trying to obtain or consolidate a dominant position in the forms market by inducing its customers to exclude a potential competitor by refusing to recommend

---

unreasonable for a dominant group to combine or coerce—is not here applicable.
Barber, "Refusals to Deal Under the Federal Antitrust Laws," 103 U.Pa.L.Rev. 847, 876–77 (1955).

**14.** Actually, there is no evidence that Standard Register had anything to do with VHA's termination of Langston's contract.

Langston as a supplier. Any such conclusion on the Court's part as to Standard Register's motive would be the product of sheer guesswork. There is no evidence to support this theory. In any event, such theory requires the Court to determine the relevant market and Standard Register's share of that market. *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Cos.*, 682 F.2d 660, 664 (7th Cir. 1982). This is a rule of reason analysis, and requires a consideration of evidence which Langston expressly disavowed any intention of presenting at the hearing. Based on the evidence presented, the Court finds Plaintiff has not shown a *per se* violation of Section 1 of the Sherman Act. Accordingly, its failure to define the relevant market and show proof of anticompetitive effect is fatal to its antitrust claim.

Because Langston has not shown that a boycott existed at the time UARCO cancelled its joint marketing agreement, the Court cannot find that UARCO joined an illegal boycott.

■ Langston has failed to show a substantial likelihood of success on the merits of its antitrust claim. Moreover, the harm it allegedly has suffered has not been shown to be more likely due to antitrust injury to competition, rather than the competitive process itself. *Lektro-Vend Corp. v. Vendo Corp.*, 660 F.2d 255, 268 (7th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). In any event, such harm does not appear to be irreparable because the damages can be accurately measured and compensated should Langston ultimately prevail. *Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir.1975).

Plaintiff's Motion for a Preliminary Injunction is hereby DENIED.