**HAYDEN PUBLISHING CO., INC., Plaintiff,**

v.

**COX BROADCASTING CORPORATION and United Technical Publication, Inc., Defendants.**

No. 79–C–414.

United States District Court, E.D. New York.

May 19, 1983.

John W. Timbers, of Ide & Haigney, New York City, for plaintiff.

Michael R. Treanor, of Plunkett & Jaffe, New York City, James A. Treanor, III, and Andrew A. Merdek, of Dow, Lohnes & Albertson, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION
## AND ORDER

COSTANTINO, District Judge.

In the above-entitled antitrust action, defendants have moved for summary judgment pursuant to Rule 56 of the Fed.R. Civ.P. In addition to opposing the motion, plaintiff has cross-moved for partial summary judgment. For the reasons set forth below, defendants' motion for summary judgment on all causes of action is hereby granted in its entirety.[1]

Plaintiff Hayden Publishing Company ("Hayden") commenced this antitrust action charging both defendants Cox Broadcasting Corporation ("Cox") and United Technical Publications, Inc. ("UTP"), a wholly-owned subsidiary of Cox, with violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and charging defendant UTP with violating Section 2. 15 U.S.C. § 2. The Section 1 claim charges that both defendants conspired in an unlawful combination and in unreasonable restraint of trade and commerce in advertising in electronic catalog directories. The Section 2 claim alleges that UTP's electronic trade reference publication, "Electronic Engineers Master" ("EEM"), has monopolized or attempted to monopolize the market for product data advertising in electronic catalog directories.

Defendants' summary judgment motion is premised upon the allegation that the plaintiff's Sherman Act causes of action are dependent upon a showing that Hayden's publication ("Gold Book") and EEM, comprise the entire "relevant product market" for sales of advertising for the electronics trade. Defendants argue that this narrow product market conflicts with commercial reality by excluding actual competitors of both publications. Accordingly, defendants contend that plaintiffs' causes of action must fail as a matter of law.

## SUMMARY JUDGMENT

■ This court is ever mindful that "summary [judgment] procedures should be used sparingly in complex antitrust litiga-

tion where motive and intent play leading roles ...." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *see Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1110 (5th Cir.1979). In the "proper circumstances" however, where plaintiffs have been afforded ample opportunity for discovery, it is clear that summary judgment does apply to antitrust suits. *See McDaniel v. General Motors Corp.,* 480 F.Supp. 666, 669–670 (E.D.N.Y.1979), *aff'd,* 628 F.2d 1345 (2d Cir. 1980). While an antitrust case ripe with issues of fact concerning motive, intent and credibility would seemingly be impervious to Rule 56 application, *see generally* Moore's Federal Practice and Procedure §§ 56.17[1], .17[5], the mere fact that a case is based upon the antitrust laws does not suspend utilization of the rule. *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d at 1111; *McDaniel v. General Motors Corp.,* 480 F.Supp. at 670.

■ Summary judgment is appropriate where, as here, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Northrop Corp. v. McDonnel Douglas Corp.,* 700 F.2d 506, 525 (9th Cir.1983). A party opposing summary judgment must present "significant probative evidence tending to support the complaint," *First National Bank v. Cities Service,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *General Business Systems v. North Am. Phillips Corp.,* 699 F.2d 965, 971 (9th Cir.1983) setting forth "concrete particulars." *Dressler v. The MV Sandpiper,* 331 F.2d 130, 133 (2d Cir.1964).

In the instant action, the court has drawn the facts of the case from the voluminous discovery record, including extensive affidavits submitted by the parties. Wherever reasonable inference can be drawn regarding the evidence, the court has taken that inference most favorable to the plaintiff. *See Reisner v. General Motors Corp.,* 671 F.2d 91, 93 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 56, 74 L.Ed.2d 112 (1982).

---

1. As the court has determined that defendants' motion be granted in its entirety, plaintiff's cross-motion for partial summary judgment is accordingly denied.

With these principles in mind, the court has determined that summary judgment is appropriate. The matter has been sufficiently developed with extensive discovery proceedings. As the movants have carried their burden of demonstrating that there are no genuine issues of material fact concerning resolution of these claims, they are ripe for decision in defendants' favor.

*Section 2 Monopolization Claim*

■ In order to state a valid claim of monopolization under § 2,[2] a plaintiff must allege that the defendant possesses monopoly power in the relevant market and has willfully acquired or maintained this power, as distinguished from enjoying it solely as a consequence of superior product, growth, development or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966); *Shaben v. Samuel Moore & Co.,* 462 F.Supp. 1321 (S.D.Iowa 1978), *aff'd,* 606 F.2d 831 (8th Cir.1979). Monopoly power is the power to control prices or to exclude competition within the relevant market. *United States v. Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. at 1703; *ALW, Inc. v. United Air Lines,* 510 F.2d 52, 55 (9th Cir. 1975).

■ The initial requirement, that a defendant possess monopoly power in the relevant market, compels a determination as to the definition and extent of that relevant market. Indeed, an antitrust plaintiff cannot prove a defendant's ability to monopolize trade absent a showing that the defendant is able to do so within the relevant economic market. *See Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.,* 614 F.2d 832, 840 (2d Cir.1980) (*"Nifty Foods"*); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1030 (2d Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). Thus, illegal monopoly power may only be appraised in terms of the competi-

tive market for the product. *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956) (*"duPont"*); *see Nifty Foods,* at 840; *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Moreover, courts are not free to accept whatever market is suggested by the plaintiff, but must examine commercial realities within the industry in question, *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 698 F.2d 1011, 1016 (9th Cir.1983) so as to determine whether plaintiff has met the burden of proving the relevant market. *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237 (8th Cir.1973); *see duPont,* 351 U.S. at 381, 76 S.Ct. at 999. In so doing, this court recognizes that "[t]he antitrust laws ...˙ were enacted for the protection of *competition, not competitors."* *Gianna Enterprises v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1353 (S.D.N.Y.1982) (emphasis in original) (*quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (*"Brown Shoe"*).

■ While determination of the relevant market is essentially a question of fact, *see, e.g., United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *International Boxing Club v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), there are specific legal guidelines which are applicable to all cases.

■ In defining the "relevant product market," the Supreme Court in *duPont,* determined that the market is composed of products that have "reasonable interchangeability" for purposes for which they are produced. 351 U.S. at 395, 76 S.Ct. at 1007. It is, therefore, the use of the product by consumers rather than the nature of the product itself, which determines the

---

**2.** 15 U.S.C. § 2 provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony,

and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

relevant product market. *Warner Amex Cable v. American Broadcasting,* 499 F.Supp. 537, 546 (S.D.Ohio 1980); *United States v. Chas. Pfizer & Co.,* 245 F.Supp. 737 (E.D.N.Y.1965).

*The Relevant Product Market*

In support of its summary judgment motion, defendants argue that in addition to EEM and Gold Book, there are a number of other publications which compete within the relevant product market. Both EEM and Gold Book are published annually and derive revenue through the sale of advertising space to suppliers of electronic products. The advertisements are then published within each publication and distributed without charge to the electronics trade. The product market, which Hayden's Section 2 claim alleges has been monopolized, consists of that market which competes for the sale of advertising.

Defendants have published EEM since 1958 while Gold Book entered the market in 1974. Defendants have asserted that the following publications compete with EEM and Gold Book within the relevant market:

(1) Micro Waves Product Data Directory ("MPDD") *

(2) Electronic Buyers' Guide ("EBG")

(3) Electronic Distributors Master Catalog ("EDMC") **

(4) I C Master **

(5) Electronic Industry Telephone Directory ("EITD")

(6) Who's Who In Electronics

(7) Thomas Register

(8) Control Equipment Master ("CEM")

(9) Interference Technology Engineers Master ("ITEM")

 \* Published by Hayden
 \*\* Published by UTP

Hayden argues that the various competitors denominated by the defendants are not "functionally interchangeable" with EEM and further, that the defendants have failed to establish that there is a "purchaser readiness to substitute" between EEM and defendants' nominees.

The "purchaser readiness to substitute" criterion is designed to measure "cross-elasticity of demand" or "reasonable interchangeability" by determining the responsiveness within the marketplace of the sales of one product to price changes of another product. *See Borden, Inc. v. F.T.C.,* 674 F.2d 498, 507 (6th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3150 (U.S. Aug. 25, 1982) (No. 82–328). In support of its argument, Hayden cites a study purporting to show minimal switching away from EEM to other publications when EEM raised its advertising prices.

■■ Hayden also insists that no other publication other than EEM responded to Gold Book's entry into the market by lowering its advertising rates.[3]

Finally, Hayden argues that even if the court were to accept all the defendants' arguments, defendants' motion should not be granted in that there has been no showing of the defendants' product market share.

■■ The defendants cite *Brown Shoe,* for the proposition that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use

---

**3.** Hayden argues that the failure of other publications to lower their prices in response to Gold Book's entry onto the market is evidence that none considered Gold Book a competitor. Thus, concludes Hayden, none should be included within the relevant product market. The court cannot accept plaintiff's argument. Any test, solely designed to measure the reaction of other publications to Gold Book's entry onto the market, would seem to focus on the wrong side of issue. By ignoring consumers and concentrating instead upon the reaction of other sellers, plaintiff's argument is of extreme-

ly limited value. *See L.G. Balfour Company v. F.T.C.,* 442 F.2d 1, 11 (7th Cir.1971); *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576 (S.D.N.Y.1958). The court notes further, that while failing to reduce prices, most of the publications cited by defendants did not raise their prices either. More importantly, the particular gauge of competitor response urged by Hayden cannot be deemed as dispositive as to this issue. The record is replete with examples of identical or equivalent advertising in editions of Gold Book and a number of the other publications, including EEM.

or the cross-elasticity of demand between the product itself and substitutes for it. 370 U.S. at 325, 82 S.Ct. at 1523. Once the outer boundaries of the product market are thus delineated, *Brown Shoe* enumerates further criteria for ascertainment of "submarkets." Included therein are "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

In the case at bar, ample evidence has been proffered (including surveys, studies, questionnaires, internal memoranda and letters) which persuades the court that reasonable interchangeability exists between EEM and the other publications cited by the defendants. In so holding, this court is guided primarily by the "reality of the marketplace." *See United States v. Empire Gas Corp.,* 537 F.2d 296, 303 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977), *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 456 (9th Cir.1966), *rev'd on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

It is clear that those publications cited by defendants are utilized to obtain product information concerning electronic products throughout the electronics industry. Suppliers of these products utilize all the publications cited (as well as EEM and Gold Book) for the purpose of advertising their products. In addition, Hayden's own studies indicate its marketing observation that publications other than EEM were in fact in competition with both Gold Book and EEM. For example, the *Fairchild Study,* prepared by Hayden, polled prospective industry customers as to their choice between EEM, Gold Book and EBG, as "the best publication" to reach the market. Further, defendants have cited numerous readership surveys conducted by electronic manufacturers (the potential customers of both Gold

Book and EEM) which indicate clearly that the manufacturers considered a wide range of publications as interchangeable with EEM and Gold Book. Despite minor differences between these publications as to format, it is the interchangeability in end use of the product rather than the product itself which determines the relevant market. *United States v. Chas. Pfizer & Co.,* 246 F.Supp. 464 (E.D.N.Y.1965); *see Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d at 1242.

Thus, while the reasonable interchangeability of a product is not the sole test for determining the relevant market, *United States v. CBS, Inc.,* 459 F.Supp. 832, 837 (C.D.Cal.1978), a determination that product interchangeability does exist, enables this court to ascertain that the "outer boundaries" of the relevant product market are not limited to EEM and Gold Book.

As to whether a valid "submarket" exists consisting solely of EEM and Gold Book, here too plaintiff is unable to substantiate its market definition.

*Submarket Analysis*

In making its submarket determination, this court is guided by the analysis of such markets by the Supreme Court in *Brown Shoe.*[4] The parties to this lawsuit have saturated the court with exhibits, attempting to document the relevant submarket criteria as enunciated in *Brown Shoe.* 370 U.S. at 325, 82 S.Ct. at 1523. The court has waded through the entirety of this material and concludes that no submarket exists which would limit the relevant product market for antitrust purposes to EEM and Gold Book.

In examining the first submarket criterion advanced in *Brown Shoe,* this court finds no showing by plaintiff regarding industry or public recognition of a separate economic entity consisting solely of EEM and Gold Book. *Id.* at 325, 82 S.Ct. at 1523. To the contrary, the evidence before this court in-

---

4. While *Brown Shoe* concerned violation of Section 7 of Clayton Act, the rule of the case has been applied to cases arising under Section 2 of the Sherman Act. *United States v. Grin-* *nell Corp.,* 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Borden Inc. v. F.T.C.,* 674 F.2d at 509–10.

dicates that the electronics industry recognizes a number of other publications as legitimate competitors of both.

As for the "particular characteristics and uses" of the directories, *id.,* plaintiff has demonstrated a degree of dissimilarity between defendants' nominees and Gold Book and EEM. Some are published on a weekly or monthly basis while EEM and Gold Book are issued annually. Plaintiff alleges further that due to their digest form, EEM and Gold Book are more likely to be retained for use in the purchase of the products advertised therein, than are the magazine-format publications cited by defendants. This court does not concur. While noting that certain distinctions between the publications do exist, this court finds nonetheless that all are within the mainstream of the electronics advertiser market such that a fluid interchange exists between advertisers of these products. *See Buffalo Courier-Exp. v. Buffalo Evening News, Inc.,* 441 F.Supp. 628, 634 (W.D.N.Y.1977) *vacated on other grounds,* 601 F.2d 48 (2d Cir.1979). Hayden's own 1977 Annual Report states that Gold Book and EEM *compete* for advertising pages with EBG. The fact remains that notwithstanding cosmetic differences, all of these publications share essentially similar functions in that they are used as advertising vehicles throughout the electronics industry.

Concerning the *Brown Shoe* criteria of "distinct customers" and "unique production facilities," 370 U.S. at 325, 82 S.Ct. at 1523, plaintiff has failed to demonstrate that any distinction or uniqueness exists.

As for any "distinct[ion] [in] prices," *id.,* the court notes that the fact that "[s]elling price between commodities with similar uses and different characteristics may vary," is merely reflective of commercial reality. *duPont,* 351 U.S. at 396, 76 S.Ct. at 1008. To divide product lines strictly by price is simply unrealistic. *Brown Shoe,* 370 U.S. at 326, 82 S.Ct. at 1524; *see Liggett & Myers, Inc. v. F.T.C.,* 567 F.2d 1273, 1274 (4th Cir.1977); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237. The particular commodity here in question (advertising space) can hardly be distinguished strictly on a price-per-page basis. Hayden's own internal memoranda indicate that customer interest in the effectiveness of the publication in which they advertise outweighs any interest solely in cost-per-page.

Consumer interest in factors other than price, negates Hayden's emphasis on the next *Brown Shoe* criterion, "sensitivity to price change." 370 U.S. at 325, 82 S.Ct. at 1523. In attempting to portray a dualistic product market and therefore defeat defendants' motion, Hayden argues that customers (i.e. advertisers) do not substitute or switch when there is a change in price of one of the publications. Hayden's studies indicate that where, for example, EEM increased its price by 22% and MPDD stood firm, no significant switching of advertisers, to MPDD took place. Similar results for other of the competitors nominated by defendants were noted as well.

Plaintiffs' reliance on this issue is not well founded. As previously noted, consumer interest in the quality of advertising impact (including such variables as EEM's past performance, art direction and writing support and industry-wide credibility) rather than low prices, is of primary importance to consumers. While the emphasis on advertising impact contrasts with the general rule within the commercial world where price is often the determining factor, it does not in and of itself create a separate product market or submarket. Quality of service can substitute without difficulty for price as the primary competitive variable, *Robinson v. Magovern,* 521 F.Supp. 842, 877 (W.D.Pa.1981) particularly where, as here, a sophisticated consumer, as opposed to the general public, has the ability to make the necessary qualitative distinctions. *Cf. Pontius v. Childrens Hosp.,* 552 F.Supp. 1352, 1365–66 (W.D.Pa.1982); *Williams v. Kleaveland,* 534 F.Supp. 912, 919 (W.D.Mich.1981) *citing* 7 Am. J. of Law & Medicine, Vol. 1, 1981 at iii.

Further, the court notes that a relevant market for a product may not be defined by focusing merely on a single factor such as

sensitivity to price change, but must instead include an evaluation of the limits of that product's competition with other products. *See George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547 (1st Cir.1974) *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

Accordingly, this court has determined that Hayden has failed to meet its threshold burden of substantiating its market definition limiting the relevant product market or submarket to one consisting solely of EEM and Gold Book. Meeting this burden is a necessary predicate for establishing a claim under Section 2. *See, e.g., Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1301 (9th Cir.1978); *City of Cleveland v. Cleveland Elec., Etc.,* 538 F.Supp. 1306 (N.D.Ohio 1980); *United States v. Chas. Pfizer & Co.,* 246 F.Supp. at 470. Plaintiff endeavors to ignore the marketplace realities in its insistence upon an artificial two-publication market theory. This court has concluded that plaintiff has failed to demonstrate that such a limited product market exists. Accordingly, the court need not compute defendants' "monopoly power" within the relevant product market. *See Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d at 1302 n. 3; *United States v. Chas. Pfizer & Co.,* 246 F.Supp. at 470.

### Section 2 Attempted Monopolization Claim

 The essential elements of Attempted Monopolization under Section 2 are (1) a "dangerous probability of success" in monopolizing a given product market, and (2) the specific intent to "destroy competition or build monopoly." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *Nifty Foods,* 614 F.2d at 841; *Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. 649, 668 (S.D.N.Y.1980), *aff'd,* 697 F.2d 495 (2d Cir.1983). Like actual monopolization, the attempt to monopolize cannot exist without first establishing the framework within which the specific intent to "destroy competition" exists. *M.A.P. Oil*

*Co., Inc. v. Texaco, Inc.,* 691 F.2d 1303, 1309 (9th Cir.1982). Thus, "[p]roof of relevant product market is a necessary element of a cause of action for monopolization or attempted monopolization." *Nifty Foods,* 614 F.2d at 840; *Jennings Oil Company, Inc. v. Mobil Oil Corp.,* 539 F.Supp. 1349, 1351 (S.D.N.Y.1982). This court has previously determined that Hayden's relevant product market theory is fatally flawed. Accordingly, defendant's motion for summary judgment dismissing the Section 2 claims of monopolization and attempted monopolization, is granted. *See McDaniel v. General Motors,* 480 F.Supp. at 675.

### Section 1 Restraint of Trade Claim

In its motion for summary judgment, defendants contend that since plaintiff has alleged *unreasonable* restraints of trade rather than any *per se* violation of Section 1[5], the legality of the activity alleged must be measured in terms of its effect upon the relevant product market. Thus, defendant argues, plaintiff's Section 1 claim stands or falls with its Section 2 claims, and must therefore fail upon this court's rejection of plaintiff's dual market theory. For its part, Hayden insists that different legal criteria govern determination of market power in a "rule of reason" Section 1 case than in a Section 2 monopolization case.

Hayden concedes that this case is not governed by any of the *per se* standards of antitrust law violation. *See, e.g., United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal territorial divisions); *United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price fixing); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3rd Cir.), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (tie-in claim). Therefore, the defendants' alleged restraint must be analyzed under the "rule of reason" standard in the context of relevant product market. *United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct.

---

**5.** 15 U.S.C. § 1 provides in pertinent part that: [e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal ....

1107, 92 L.Ed. 1533 (1948); *North American Soccer v. National Football League,* 670 F.2d 1249 (2d Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *White and White, Inc. v. American Hospital Supply,* 540 F.Supp. 951, 979 (W.D. Mich.1982).

■ \ Under the rule of reason analysis, the elements of restraint of trade are:

(1) An agreement among two or more persons or distinct business entities;

(2) which is intended to harm or unreasonably restrain competition;

(3) and which actually causes injury to competition.

*Kaplan v. Burroughs Corp.,* 611 F.2d 286, 290 (9th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). A crucial determination therefore, is whether or not the alleged conduct of the defendant has impact upon competition in general, *DeVoto v. Pacific Fidelity Life Ins. Co.,* 618 F.2d 1340, 1344 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Kaplan v. Burroughs Corp.,* 611 F.2d at 291, as "[i]t is the impact upon competitive conditions in a definable product market which distinguishes the antitrust violation from the ordinary business tort." *Id.*

■ The foregoing discussion leaves little doubt that a determination as to the boundaries of the relevant product market is essential in order to measure the anti-competitive effect if any, of defendants' activities.[6] *American Aloe Corp. v. Aloe Cream Laboratories, Inc.,* 420 F.2d 1248, 1256 (7th Cir.), *cert. denied,* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *see Kaplan v. Burroughs Corp.,* 611 F.2d at 291. While Hayden concedes that a market determination is required, it argues that a "different (and much less difficult to prove) standard is mandated than that used to determine Section 2 monopoly power." Plaintiffs' Reply Memorandum at 6. Nonetheless, Hayden has not met the burden required under Section 2, of demonstrating any anti-com-

petitive effect upon the relevant market, *see McDaniel v. General Motors Corp.,* 480 F.Supp. at 674, thereby failing to make out a prima facie case under the rule of reason analysis. *See Independence Tube Corp. v. Copperweld Corp.,* 691 F.2d 310, 323 (7th Cir.1982) *petition for cert. filed,* 51 U.S. L.W. 3567 (U.S. Jan. 28, 1983) (No. 82–1260); *Dougherty v. Continental Oil Co.,* 579 F.2d 954, 962 (5th Cir.1978).

Assuming *arguendo* that this court were to accept Hayden's "much less difficult to prove" standard of product market definition, consideration of the effects of the defendants' alleged conduct upon the relevant market is still required. *See George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d at 560. Hayden's failure to adequately define the relevant product market or to demonstrate any indication of anti-competitive effect upon that market, is thus fatal to its Section 1 claim. *Langston Corp. v. Standard Register Co.,* 553 F.Supp. 632, 640 (N.D.Ga.1982).

Accordingly, defendants' motion for summary judgment on plaintiffs' Sherman Act Sections 1 and 2 causes of action is hereby granted and the action is dismissed in its entirety.

So ordered.

---

6. Had plaintiff alleged a *per se* violation of Section 1, such a determination would not be required. *See Klor's v. Broadway-Hale Stores,*

*Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Langston Corp. v. Standard Register Co.,* 553 F.Supp. 632, 638 (N.D.Ga.1982).