**DAVIS–WATKINS COMPANY, Plaintiff,**

v.

**SERVICE MERCHANDISE COMPANY, INC., Defendant and Counter–plaintiff,**

v.

**DAVIS–WATKINS COMPANY and Amana Refrigeration, Inc., Counter–defendants.**

No. 77–3279.

United States District Court, M. D. Tennessee, Nashville Division.

Oct. 21, 1980.

F. Clay Bailey, Jr., John R. Edwards, Nashville, Tenn., for Davis–Watkins.

Stewart F. Kresge, Stanley M. Chernau, Nashville, Tenn., George E. Barrett, Nashville, Tenn., St. John Barrett, Washington, D. C., for Service Merchandise, Inc.

Robert J. Walker, Steven A. Riley, Nashville, Tenn., for Amana Refrigeration, Inc.

## MEMORANDUM

WISEMAN, District Judge.

This case is before the Court on cross motions for summary judgment by Amana Refrigeration and Service Merchandise Company on the per se antitrust theories. Service Merchandise's request for a jury trial is also before this Court and is addressed in this memorandum.

The original complaint in this lawsuit was filed by Davis–Watkins Company [Davis–Watkins] against Service Merchandise Company [Service Merchandise] for violation of the Robinson–Patman Act, 15 U.S.C. § 13a.[1] The gravamen of the complaint was that Service Merchandise had engaged in predatory pricing of Amana Radarange microwave ovens. Davis–Watkins is the exclusive distributor for Amana products in a sixty–four county area covering southern Kentucky, middle Tennessee, and northern Georgia and Alabama. Service Merchandise filed a counterclaim against Davis–Watkins and Amana Refrigeration alleging violations of the federal antitrust laws. The Robinson–Patman Act claim of Davis–Watkins has been settled.[2] Therefore, the antitrust counterclaim is the sole basis for this lawsuit.

Service Merchandise, a Tennessee corporation, is a retail merchandising firm, which owns and operates over one hundred catalog showrooms in twenty–two states.[3] Sales of a variety of merchandise result from both mail order and direct sales. Service Merchandise is one of the largest catalog showroom merchandisers in the country. Its success is attributable at least in some degree to its no frills approach to marketing.

Amana Refrigeration, Inc., a Delaware corporation, manufactures, among other things, countertop microwave ovens for home use. Amana is undoubtedly a successful firm; its share of the microwave oven market alone approximates twenty percent. Since January 1, 1978, Amana's contracts with its distributors have divided the United States into specific geographical sales territories. The thrust of Service Merchandise's claim against Amana is that the contracts between Amana and its distributors established geographic, customer, and location restrictions that amount to restraints of trade in violation of section 1 of

1. Although Davis–Watkins also alleged violations of the Tennessee unfair sales law, Tenn. Code Ann. 69–302–306 pendent jurisdiction was not accepted by this Court. Order of August 10, 1977.

2. Order of October 10, 1980.

3. Figures taken from the 1979–80 Service Merchandise Catalog. In 1976, Service Merchandise operated fifty–seven showrooms in thirteen states.

the Sherman Act. Basically, Amana responds that the restrictions are reasonable under the rule of *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

Amana distributes its products through sixty–seven wholesale distributors, of which nine are wholly owned branches of Amana, and some 3,500 authorized retail dealers. Each distributor executes a form distributorship agreement with Amana. Prior to January 1, 1978, each distributor was assigned a geographical area of primary responsibility for the distribution of Amana's products. No restrictions were placed on the Amana distributor or dealer concerning where or to whom they could resell Amana products. Each distributor was expected, however, to perform satisfactorily its sales and service responsibilities in its respective geographic territory.

In January, 1978, Amana modified its distribution system. Under the 1977 agreement, the distributor had to agree, among other things, "[t]o purchase for resale, on its account, products manufactured or offered for sale by Amana." The 1978 agreement stated that the distributor agreed "[t]o purchase, on its own account, for resale only to authorized Amana dealers located within distributor's authorized territories products manufactured or offered for sale." The distributors were also provided with new dealer contracts, which limited the dealers to sell Amana products only from the locations specified in the contract and limited resale to the end–user customer. These three restrictions, (1) geographic territorial restrictions for distributors, (2) dealer location restrictions, and (3) customer limitations for both distributors and dealers, are the backbone of Amana's distribution system and give rise to the basic complaint of Service Merchandise.

The facts giving rise to this litigation resulted from Service Merchandise's attempts to buy Amana microwave ovens for resale. Service Merchandise wanted the ovens, but almost no one in Amana's distribution chain would sell. In 1976, Service Merchandise attempted to place an order for six hundred Amana microwave ovens with Davis–Watkins. Davis–Watkins refused to fill the order. Service Merchandise obtained a shipment of two hundred Radaranges from W.S. Bruno Company in New York and put the Radaranges on sale in Nashville during December, 1976.[4]

Various Amana distributors and dealers then complained to Amana regarding the Service Merchandise sale. Davis–Watkins was the initial complainant. Service Merchandise had obtained the Radaranges through transshipment from a New York distributor. On October 3, 1977, Amana announced a clarification in its transshiping policy. During 1977 an Amana dealer in Columbia City, Indiana, and a branch manager in Chicago, Illinois, wrote Amana complaining of the Service Merchandise sale. Service Merchandise alleges that these letters and complaints resulted in the clarification and 1978 contractual restrictions. The contractual restrictions, among other things, prevented Amana distributors and dealers from selling microwave ovens to Service Merchandise.

Service Merchandise alleges per se illegality under four different theories: group boycott, horizontal market division, price stabilization, and vertical market division. If these fail Service Merchandise urges that the Amana system be tested under the rule of reason. Amana moved for summary judgment against each of Service Merchandise's per se theories. Service Merchandise responded with a motion for summary judgment on the issue of liability, relying on its rule of reason argument as well as its per se theories. Initially, the Court notes that Service Merchandise is not entitled to summary judgment on its rule of reason theory because a trial on the merits is necessary to determine the reasonableness of Amana's system of distribution. The per se theories, however, are susceptible to summary judgment disposition.

4. Davis–Watkins' Robinson–Patman Act claim was based on the sale of these Radaranges. It alleged that Service Merchandise's prices, between $429.97 and $449.97, amounted to illegal price discrimination.

Amana's motion for partial summary judgment is properly before this Court. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). When the law is well developed, as it is with regard to Service Merchandise's per se theories, and the products of lengthy discovery are before the Court, summary judgment is particularly appropriate.

This Court holds that Amana is entitled to summary judgment against each of Service Merchandise's per se theories. The instant case challenges nonprice vertical restrictions; in no material way, for the purpose of these motions, is it distinguishable from *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The case requires a determination of reasonableness and a trial will be held on that issue. Any relevant evidence bearing on the reasonableness or perniciousness of Amana's distribution system will be admitted. No need has been demonstrated, however, to submit frail claims of per se illegality to the trier of fact. To do so would merely serve to confuse and obfuscate the issues.

■ Section 1 of the Sherman Act makes "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . illegal." 15 U.S.C. § 1. In *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 725, 55 L.Ed. 619 (1911), the Supreme Court held that the statute prohibits only *unreasonable* contracts, combinations, or conspiracies in restraint of trade.[5] The courts have fashioned rules of per se illegality, however, for

certain practices because of their pernicious effect on competition.

[C]ertain agreements or practices . . . because of their pernicious effect upon competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused with a business excuse for their use.' This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Northern Pacific Railroad Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 549–50 (1958).

■ Traditionally, group boycotts or concerted refusals to deal are cited as per se illegal restraints. Service Merchandise attempts to characterize the conduct of Amana, its distributors, and its dealers as a concerted boycott. That Davis–Watkins and other distributors refused to deal with Service Merchandise is undisputed. Exclusive distributorships, however, are not boycott agreements. *Klor's v. Broadway–Hale Stores*, 359 U.S. 207, 212, 79 S.Ct. 705, 709–10, 3 L.Ed.2d 741, 745 (1959). Except for the refusal by Davis–Watkins, all of the refusals to sell to Service Merchandise occurred after January 1, 1978, when Amana's tough territorial, location, and customer restrictions were imposed. The only way

---

**5.** In a later case, *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), Justice Brandeis gave a classic description of the rule of reason.

Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy com-

petition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 244, 62 L.Ed. at 687.

Service Merchandise could sustain a group boycott theory is to show that either the distributors or the dealers demanded the restrictions from Amana so that all members of either group would comply with the refusal to sell to Service Merchandise. Such a case cannot be made. Only Davis–Watkins was in any position to make such a demand before the restrictions were handed down, and the incidence of complaints by dealers and distributors is simply insufficient to make out a per se theory of illegality. Reading the pleadings, depositions, and other records on file in the light most favorable to Service Merchandise, the sole complaint by Davis–Watkins and the letters from dealers and distributors would not allow this Court to find a group boycott.[6]

■ Over three years ago discovery was commenced in this case. The Court has masses of documents before it. Service Merchandise alleges a group boycott in its pleadings, but the record evidence simply does not support that theory. Group boycott is a theory that attaches per se illegality to horizontal concerted actions—concerted action by competitors of Service Merchandise. *Blackburn v. Crum & Forster*, 611 F.2d 102, 104 (5th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 387 (9th Cir. 1978) 99 S.Ct. 1280, *cert. denied,* 440 U.S. 936, 59 L.Ed.2d 494, (1979); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). In *Blackburn v. Crum & Forster, supra,* the Fifth Circuit affirmed summary judgment against a group boycott theory similar to Service Merchandise's theory in this case. The alleged conspirators were suppliers of insurance and the plaintiff was an insurance broker. The Fifth Circuit correctly held the per se rule inapplicable because the plaintiff was not a competitor of the insurance companies. 611 F.2d at 104.

Moreover, the instant case does not involve the pernicious horizontal arrangements against which the per se rules apply with such force. Service Merchandise's second per se theory of illegality is horizontal market division. In *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), the Supreme Court held that division of markets by firms in a horizontal relationship amounted to a per se illegal restraint on competition. The *Topco* defendants were operators of independent grocery stores who were in competition with large grocery store chains. The chains sold items that were nationally advertised, so–called house brands, and this enhanced their competitive strength. The pernicious action by the *Topco* defendants was their creation of a subsidiary for the purpose of labeling and marketing products with the Topco brand. The brand could be advertised like the chain–stores' brands, and the independents' competitive strength would be enhanced. The Supreme Court held, however, that the per se doctrine was the proper rule.[7] The horizontal agreement of the independents was the type of naked restraint for which the per se rules were created. *Id.* at 608–10, 92 S.Ct. at 1134–35, 31 L.Ed.2d at 526–27. *See Northern Pac. Ry. v. United States*, 356 U.S. at 5, 78 S.Ct. at 518, 2 L.Ed.2d at 549–50.

■ The record evidence in this case in no way demonstrates that the territorial, customer, and location restrictions were the result of a horizontal agreement. Nothing in the record, compiled after three years of discovery, shows that joint pressure was exerted by Amana distributors for Amana to implement the restrictions. Evidence of a few complaints by dealers and distributors is present. Mere complaints, however, do not support an inference of per se illegal horizontal market division.

Service Merchandise also urges the following theory as a per se antitrust violation.

---

6. In any event, if at trial, Service Merchandise is able to prove that the *purpose and effect* of the 1978 restrictions was to exclude competition, then it is entitled to a judgment under any antitrust theory.

7. *But see United States v. Topco Associates, Inc.*, 1973 Trade Reg.Rep. (CCH) '' 74,485 (N.D. Ill.1973).

It is the theory of [Service Merchandise's] case that the allocation of sales territories among Amana distributors and independent branches and the enforcement of the customer and location restrictions upon the dealers was part of a scheme to prevent price competition between distributorship areas, both at the wholesale and retail levels, and to thereby stabilize prices within each distributorship area.

Memorandum of Service Merchandise in Opposition to Motion of Amana for Partial Summary Judgment 21.

■ Service Merchandise concedes that Amana did not engage in resale price maintenance, *id.* at 22, or price fixing, *id.* at 21. Its only theory is that Amana's nonprice restrictions tend to prevent intrabrand competition, and thus enhance price stabilization. This is a theory that must be tested under the rule of reason. When a party does not allege a traditional anticompetitive restraint with which the courts have had considerable experience in evaluating its harmful effects on competition, the Court should not apply a per se rule. *See Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19 n.33, 99 S.Ct. 1551, 1562 n. 33, 60 L.Ed.2d 1, 16 n. 33 (1979); *United States v. Topco Associates, Inc.*, 405 U.S. at 607–08, 92 S.Ct. at 1133, 31 L.Ed.2d at 525 (per se rule inappropriate until after considerable experience with the type of challenged restraint).

■ To be sure, the Supreme Court declared in *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), that "a combination formed for the purpose and with the effect of . . . stabilizing the price of a commodity . . . is illegal per se," *id.* at 223, 84 L.Ed. at 1166, 60 S.Ct. at 844. Service Merchandise, however, attempts to include too broad a theory into this rule. What Service Merchandise complains of, in every allegation, are the territorial, customer, and location restrictions. Since *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), it is beyond question that these types of vertical restraints are not the kind of practices that "facially appear[ ] to be [the type] that would always or almost always tend to restrict competition."

*Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1, 16 (1979). That Service Merchandise alleges a tendency of the vertical restrictions to stabilize price does not move the restriction into the category of naked restraints against which the per se rules apply.

■ Finally, Service Merchandise alleges that the vertical restrictions themselves are per se illegal. This theory is totally rejected by the Supreme Court's decision in *Continental T.V., Inc. v. GTE Sylvania Inc., supra.* In *Sylvania*, plaintiff, retailer, had been a party to a franchise agreement with defendant, manufacturer. The agreement included a location clause, which required the retailer to sell only from the location specified in the agreement. In *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), territorial and customer restrictions placed on the resale of goods by distributors were held per se illegal under the Sherman Act. In *Sylvania*, the Court overruled *Schwinn*, 433 U.S. at 58, 97 S.Ct. at 2562, 53 L.Ed.2d at 585, and held that the vertical location restriction should be judged under the rule of reason.

Subsequent circuit court decisions have held correctly that *Sylvania* is not limited to location clauses. In *General Beverage Sales Co. v. East–Side Winery*, 568 F.2d 1147 (7th Cir. 1978), the court held that *Sylvania* applied to vertical territorial restrictions, *id.* at 1153–54. Clearly, the correct rule in a case challenging vertical restrictions is the rule of reason. *See Daniels v. All Steel Equip., Inc.*, 590 F.2d 111 (5th Cir. 1979); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *H & B Equip. Co. v. International Harvester*, 577 F.2d 239 (5th Cir. 1978); *National Auto Brokers Corp. v. GM Corp.*, 572 F.2d 953 (2d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Eastern Scientific Co. v. Wild Heerbrugg Instruments, Inc.*, 572 F.2d 883 (1st Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978); *General Beverage Sales Co. v. East–Side Winery*, 568 F.2d 1147 (7th

Cir. 1978); *Lamp Liquors, Inc. v. Adolph Coors Co.*, 563 F.2d 425 (10th Cir. 1977) (cases following *Sylvania* and applying the rule of reason).

### JURY TRIAL REQUEST

Service Merchandise did not demand a jury in its initial responsive pleading. Fourteen months after its counterclaim was filed, Service Merchandise filed leave to amend its counterclaim and demanded a jury trial. This Court granted leave to amend, but reserved ruling on the jury demand. Amana opposed the jury request on the ground that since Service Merchandise had raised no new issues in its amended counterclaim, it was not entitled to a jury trial as of right. According to Amana, the Court in its discretion should deny the jury request under Federal Rule of Civil Procedure 39(b) because of the complexity of this case. In any event, Amana argues, the issues in the instant case are so complex that to grant Service Merchandise a jury trial would violate Amana's due process rights. *See In re Japanese Electronic Products Antitrust Litigation*, 631 F.2d 1069 (3d Cir. 1980). Service Merchandise urges, however, that it cannot be deprived of its seventh amendment right to trial by a jury.

The seventh amendment provides that "the right to trial by a jury shall be preserved." U.S.Const. amend. VII. Limits on the preservation of this right are imposed by Rule 38 of the Federal Rules of Civil Procedure: "Any party may demand a trial by a jury ... not later than ten days after the service of the last pleading directed to [an issue triable of right by a jury]." F.R.Civ.P. 38(b). Failure to make a timely demand constitutes a waiver of a party's right to jury trial. F.R.Civ.P. 38(d). That parties may inadvertently waive their seventh amendment right to a jury trial is well settled. *See* 9 Wright & Miller, Federal Practice and Procedure § 2321 (1971) (citing cases). The court, exercising its discretion, may grant relief from the waiver.[8] The courts should grant a jury trial in the absence of strong and compelling reasons to

the contrary. *Bush v. Allstate Ins. Co.*, 425 F.2d 393, 396 (5th Cir.), *cert. denied*, 400 U.S. 833, 27 L.Ed.2d 64, 91 S.Ct. 64 (1970); *Swofford v. B & W, Inc.*, 336 F.2d 406, 409 (5th Cir. 1964), *cert. denied*, 379 U.S. 962, 13 L.Ed.2d 557, 85 S.Ct. 653 (1965); *Davis v. Elkins*, 69 F.R.D. 705, 706 (E.D.Tenn.1975).

The complexity of a case may justify the refusal to grant a discretionary jury trial motion. In *Rutledge v. Electric Hose and Rubber Company*, 511 F.2d 668 (9th Cir. 1975), an antitrust plaintiff failed to make a timely jury demand. On appeal the Ninth Circuit held that:

> In our weighing of the nature and totality of all circumstances of the case, the complexity of expected jury questions, and the public interest generally, we cannot say that the denial of a jury trial under the provisions of Rule 39(b) was an abuse of judicial discretion.

*Id.* at 675 (citing 9 Wright & Miller, Federal Practice & Procedure § 2334 n.49 (1971)). Therefore, this Court could refuse to allow a jury trial without reaching the due process versus seventh amendment issue, which was confronted by the Third Circuit in the *Japanese Electronic Products* case. The Court is of the opinion, however, that this is an appropriate case for a jury. After the parties' settlement of the Robinson–Patman Act claims and this Court's grant of summary judgment against Service Merchandise's per se claims, one basic issue remains: whether Amana's system of distribution is unreasonable under the antitrust laws. This issue is not too complex for a jury of laymen to decide.

Unfortunately, no litmus–paper test exists to determine complexity. The issue is whether the case is so complex that a jury cannot make a rational decision based on the evidence adduced at trial. In the *Japanese Electronic Products* case, Judge Seitz enunciated three factors for the district court to weigh when determining complexity.

> [F]irst, the overall size of the suit, the primary indicia of which are the estimat-

---

**8.** Federal Rule of Civil Procedure 39(b) provides that "the court in its discretion upon

motion may order a trial by a jury of any or all issues."

ed length of trial, the amount of evidence to be introduced and the number of issues that will require individual consideration; second, the conceptual difficulties in the legal issues and the factual predicates to these issues, which are likely to be reflected in the amount of expert testimony to be submitted and the probable length and detail of jury instructions; and third, the difficulty of segregating distinct aspects of the case, as indicated by the number of separately disputed issues related to single transactions or items of proof.

*Id.* 631 F.2d at 1088.

The estimated length of trial of the instant suit is six weeks. Although this is longer than the average case tried in the Middle District of Tennessee, it is not so long as to expect lapses of memory. This Court has cleared its docket for the trial of the case and anticipates very few interruptions.[9]

Undoubtedly, the amount of evidence to be introduced is massive. Amana's entire system of distributing and promoting Radaranges must be examined. The evidence, no matter how great an amount, will focus on one central issue: the reasonableness of Amana's vertical restrictions. Because the number of legal issues that will require individual consideration has been reduced from six (the Robinson–Patman Act theory, the four per se theories, and the rule of reason theory) to one, the amount of evidence does not, in and of itself, complicate the case beyond a jury's comprehension.

The amount of expert testimony to be introduced at trial is not readily ascertainable. In the parties' list of witnesses who may be called at trial, four of the seventy–four persons listed are experts.[10] The opinion of this Court is that the expert testimony in this case will help clarify the conceptual difficulties rather than obfuscate the issues.

The jury instructions in this case will be lengthy. The jury instructions in every rule of reason case challenging the vertical restrictions of a national manufacturing firm require lengthy jury instructions. Every such case, however, is not too complex for a jury. Therefore, lengthy jury instructions alone will not require a finding of complexity in this case.

The Court will assist the attorneys in segregating distinct aspects of the case. Discovery has proceeded in this case for over three years. The attorneys should be well prepared for trial. The Court perceives few problems in separating the distinct aspects of the case.

Moreover, any determination of complexity must consider the effect that a finding of complexity in this case will have on other cases. Although this is a large case with respect to what is at stake, and although rule of reason cases generally require sophisticated economic evidence for the purpose of focusing on alleged harm to competition, this Court is reluctant to find sufficient complexity to remove the case from the jury. The civil jury trial was provided for in the Bill of Rights to the United States Constitution and has been a hallmark of the English and American system of justice for centuries. A discretionary request for a jury trial should not be denied unless compelling reasons support the denial. The rationale for denying a jury in this case is simply not compelling. Because of this Court's basic reluctance to deny a jury trial, and because this case involves only one claim for relief, the antitrust rule of reason claim, Service Merchandise's request for a jury is granted.

---

**9.** Trial is scheduled from 8:30 to 1:00 so that sentencings and speedy trial cases may be heard without interrupting the instant case.

**10.** Service Merchandise lists fifty–three witnesses of whom two appear to be experts.

Amana lists forty–four witnesses, three of whom are designated as experts. Both parties name one of the same expert and nineteen of the same nonexpert witnesses.