**ADVISORY INFORMATION AND MANAGEMENT SYSTEMS, INC., Plaintiff,**

v.

**PRIME COMPUTER, INC., Defendant.**

**No. 3–83–0972.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Sept. 20, 1984.

See also, D.C., 40 B.R. 1001.

Daniel C. Kaufman, Paul E. Jennings, Waddey & Newport, Nashville, Tenn., for plaintiff and counterdefendant W.C. Cargile, Sr.

Steven A. Riley, Bass, Berry & Sims, Nashville, Tenn., James C. Burling, David H. Erichsen, Hale & Dorr, Boston, Mass., for defendant Prime Computer, Inc.

Thomas Wardlaw Steele, Nashville, Tenn., for Southern States Corp.

## MEMORANDUM

WISEMAN, Chief Judge.

This case involves a dispute between Advisory Information and Management Systems, Inc. [AIMS] and Prime Computer, Inc. [Prime], and raises issues of antitrust law and contract law. The matters before the Court are plaintiff AIMS' motion for a preliminary injunction and defendant Prime's motion for summary judgment.[1] In order to address these matters, it is necessary to examine the history of transactions between the two parties.

Prime is a manufacturer of small and medium-sized general purpose computers. It produces actual components or hardware, operating software, which manages the resources and operations of the computer system, application software, and accessories. Prime's components are produced to be compatible with one another so that add-on and upgrade equipment may be added to increase system performance without having to replace the entire system. Prime entered into several dealer agreements in 1978, including one with AIMS' predecessor in interest, Tennessee Data Systems. The dealers apparently approached Prime because they desired hardware sufficient to support their application software, which performs special functions as part of a complete computer system. Prime retained these dealers because it did not produce very much application software at that time and wanted to market its products to end users who wished to purchase entire systems. (Finney Aff. ¶ 4; Kelly Aff. ¶ 3; Naylor Aff. ¶ 2). Prime's direct sales force had been unable to reach these customers successfully. Prime offered the dealers incentive price discounts to help their marketing. Prime emphasized that these dealer sales of Prime equipment were only for combined sales with the dealer's application software for users principally interested in complete systems with application software. (Finney Aff. ¶ 5; Kelly Aff. ¶ 3; Davidson Aff. ¶ 4).

AIMS is a full line dealer of hardware, software, systems, and service bureau operations. Its principal officer, William Cargile, was also an officer in Tennessee Data Systems. He entered into a dealer agreement with Prime, which was assigned to his new company, AIMS, on September 4, 1980. The dealer agreement did not specifically prohibit sales of Prime hardware and equipment apart from complete systems incorporating application software. The agreement provided that the dealer was Prime's exclusive dealer of "Information" operating software in the area of Tennessee and was entitled to sell systems and products enumerated by Prime and listed in Schedule 2 to the agreement. (Kirby Aff. Exhibit A). The agreement also provided sales quotas, listing the number of systems the dealer was required to meet to satisfy and maintain the agreement. *Id.* 3.1 Schedule 3). Prime was obligated to install the equipment sold, (*id.* 7), and the dealer was required to promote the Prime products and to maintain facilities to display and demonstrate the systems, (*id.* 8).

Prime became aware in early 1981 that some dealers engaged in "hardware-only" sales or sales of Prime's discounted equipment without application software. Prime considered these sales to be disruptive of

---

**1.** At oral argument on pending motions, June 22, 1984, plaintiff conceded that it is not entitled to summary judgment. Prime has continued to pursue its own motion for summary judgment.

its direct sales efforts and contrary to its original understanding with its dealers. (Finney Aff. ¶ 7; Kelly Aff. ¶ 4). Prime attempted to get the dealers to stop these sales and realized the dealer agreement did not squarely prohibit them. Prime contemplated reaching a new dealer agreement that would limit or remove the dealers' exclusive sales territories for its "Information" operating software and allow for direct sales of this software by Prime. (Finney Aff. ¶ 8, Kelly Aff. ¶ 5, Davidson Aff. ¶¶ 5, 6). When presented with the new proposal in early 1982, the existing dealers refused to agree to it. (Finney Aff. ¶ 9; Kelly Aff. ¶ 6; Davidson Aff. ¶ 6; Naylor Aff. ¶ 3).

In mid-1982, Prime convened a "pricing task force." (Kaufman Supplemental Aff. Exhibit 13; Plaintiff's Appendix 136–37). The committee concluded that domestic sales were made with average discounts of about 20 percent. It found also that customers considered Prime "an aggressive and disorganized discounter." Prime's president "emphasized that discounting is a learned activity" that can be "unlearned." (*Id.*). Other Prime internal memoranda indicate that in June of 1982, it targeted AIMS as a "hardware broker," and in the same notice stressed that AIMS was in default of its dealer quota. (Kaufman Aff. Exhibit 4; Plaintiff's Appendix 81–82). Prime planned to place AIMS on probation for brokering and then terminate its dealer agreement. (*Id.*).

Prime sent notices to most of its dealers in June or July of 1982, advising them that they were in default of their dealer quotas. AIMS received one such letter on June 15, 1982. (Cargile Aff. ¶ 8 and Exhibit 3; Plaintiff's Appendix 11). At the July 1982 dealer meeting, many dealers, including AIMS, challenged the default letters and Prime's plans to remove the dealers' exclusivity for sales of "Information" software. (Kelly Aff. ¶ 9; Davidson Aff. ¶¶ 7, 8; Nay-

lor Aff. ¶¶ 4, 5). Prime agreed to negotiate disagreements after the dealers considered retaining an attorney. Prime suspended action on the default letters pending analysis of the dealer program. (Cargile Aff. Exhibit 4; Plaintiff's Appendix 12). Most of Prime's dealers, 82 percent, were in default at this time. (Prime document-Plaintiff's Appendix 187). The dealers selected two negotiators, Davidson and Naylor, to negotiate on their behalf. AIMS and its president Cargile, authorized and supported these negotiations. They were informed of progress by the negotiators. (Davidson Aff. ¶ 8; Kelly Aff. ¶ 11; Naylor Aff. ¶¶ 5, 6, & Exhibit A).

In the fall of 1982, AIMS ordered hardware from Prime for resale to DataMation Data Centers [DataMation], including a complete system as well as separate add-on and upgrade hardware. (Supplemental Cargile Aff. ¶ 21 and Exhibit 14; Plaintiff's Appendix 28, 43). Prime received notice on October 27, 1982, that AIMS was the source of equipment sold at discount to end-uses and installed and maintained by Prime's field engineering staff. Prime's vice president for marketing Bob Claussen emphasized that this must be stopped. (Prime document, Plaintiff's Appendix 123). Prime planned to "make a file" on AIMS because of this. (Plaintiff's Appendix 133).

The negotiations between Prime and the dealer committee produced a proposed new amendment to dealer agreements. (Kirby Aff. Exhibit B). The amendment allowed dealers to retain exclusivity for sales of "Information" software but allowed Prime to reduce areas of exclusivity for poor sales. It also reduced sales quotas for dealers. Additionally, it forbade "hardware-only" sales, allowing sales of add-on and upgrade equipment only where incorporated into a system with application software or dealer services "rendered prior to sale or lease to any end user."[2] (*Id.* ¶ 3).

2. The applicable provision states:
   Dealer hereby certifies that each Prime system listed on the Prime Computer, Inc. Domestic Price List attached as Schedule 2 to the Dealer Agreement, purchased and licensed

under the cited Dealer Agreement, is to be incorporated into a system consisting of Dealer application software, which Dealer then sells or leases in the regular course of its business. Dealer may substitute Dealer ser-

The amendment also provided for additions to the schedule of application software allowed for incorporation into systems with Prime hardware. It provided that additions had to be made with the prior consent of Prime, "which consent shall not be unreasonably withheld." (*Id.*). *See supra* footnote 2. On November 5, 1982, Prime forwarded the proposed amendment to AIMS for acceptance. (Cargile Aff. ¶¶ 10, 11 and Exhibit 5; Plaintiff's Appendix 4–5, 13).

There is some dispute regarding the "concerted activity" underlying adoption of the amendment. President Cargile asserts that the representatives of the dealer committee, Naylor and Davidson, had stated prior to negotiations that price cutting by DataMation and other "hardware brokers" had to be stopped by cutting off their supply. (Cargile Aff. ¶ 11, Plaintiff's Appendix 5). Cargile also claims that Prime's eastern operations dealer business manager, Jack Kelly, had told Cargile that Prime was under pressure from its direct sales force and other dealers to prevent sales to DataMation because their discounting practices competed with Prime and its dealers. (*Id.* § 5; Plaintiff's Appendix 4). These allegations support AIMS' contention that the amendment was the result of concerted activity between Prime and the independent dealers. The negotiators themselves and Prime personnel, however, claim that the provision, called an "added value" provision, originated exclusively with Prime. (Davidson Aff. ¶ 10; Naylor Aff. ¶ 8; Kelly Aff. ¶ 16). They claim that the dealer negotiators fought against adoption of the added value provision but ultimately were forced to concede it to attain other concessions from Prime. (*Id.*). Davidson and Naylor each specifically deny ever

making statements to Cargile that price cutting by hardware brokers had to be stopped by cutting off their supply. (Davidson Aff. ¶ 12; Naylor Aff. ¶ 10). Kelly specifically denies ever telling Cargile that he was under pressure from other dealers to prevent "hardware-only" sales. (Kelly Aff. ¶ 16). These statements support Prime's assertion that the added value restriction was adopted unilaterally by Prime, without concerted activity. At any rate, in September 1982, when Naylor and Davidson advised dealers of the progress of negotiations, they described the added value provision as "a desireable [sic] objective" and indicated no opposition to it. (Cargile Aff. Exhibit 7; Plaintiff's Appendix 21). They stressed that Prime wanted the provision "to try and stop gross discounting by a Dealer against PRIME's direct sales force, or against another Dealer." (*Id.*).

Prime dealers were given the choice of signing the amendment or continuing under their original agreements. (Davidson Aff. ¶ 11, Kelly Aff. ¶ 13, Naylor Aff. ¶ 9). Under the old agreements, however, most were threatened with default for failure to meet the previous quotas. Several days after sending the proposed amendment to AIMS for signature on November 5, 1982, Prime's Jack Kelly telephoned AIMS' William Cargile to determine whether he would sign. Cargile indicated that he would agree to the amendment. (Kelly Aff. ¶ 11). On November 12, 1982, Kelly ordered AIMS' pending orders "on hold" because they were "hardware only" orders and were contrary to the new amendment to the dealer agreement. (Kaufman Supplemental Aff. Exhibit 9, Plaintiff's Appendix 121; Kelly Aff. ¶ 14). On November 18, 1982, Kelly canceled the pending orders

vices for the requirement to add application software, and such services may be rendered by either the Dealer or any party in behalf of the Dealer or having a contractual relationship with the Dealer, so long as such services are rendered prior to sale or lease to any end user. Application software to be included in Prime Systems purchased hereunder is listed in Exhibit B attached hereto and made a part hereof. Additions to and deletions from the

Exhibit B list of application software may be made from time to time subject to the prior written consent of Prime, which consent shall not be unreasonably withheld. Dealer agrees that in no event shall Prime systems purchased/licensed hereunder be resold, leased, or otherwise transferred without said application software or the performance of services by the Dealer as aforesaid.

from AIMS. (Kaufman Supplemental Aff. Exhibit 8; Plaintiff's Appendix 103; Kelly Aff. ¶ 15). There is some dispute about whether Kelly informed Cargile that cancellation was based on the new amendment. (*Compare* Supplemental Cargile Aff. ¶ 25, Plaintiff's Appendix 29 *with* Kelly Aff. ¶ 15). Kelly did send a letter dated December 3, 1982, stating that the orders were canceled because Prime "will not accept equipment-only orders for items being purchased by AIMS, Inc. for others, who, in turn, compete with our Direct Sales or Authorized Reseller Sales." (Cargile Supplemental Aff. Exhibit 17; Plaintiff's Appendix 57, 124, 139). Regardless of whether Prime actually relied on the amendment to the dealer agreement in canceling AIMS' orders, the amendment provided a contractual basis for rejecting the orders. The amendment, when signed by Cargile for AIMS in November of 1982 had an effective date of September 15, 1982. (Kirby Aff. Exhibit B; Cargile Aff. ¶ 10 and Exhibit 5; Plaintiff's Appendix 16). After signing, AIMS was thus bound by the terms of the amendment for the pending orders that Prime canceled on November 18, 1982.

## SHERMAN ACT SECTION 1

■ AIMS argues that Prime's cancellation of orders pursuant to its policy against "hardware only" sales was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This statute proscribes concerted activity in restraint of trade. Prime has challenged this allegation in a motion for judgment on the pleadings and in a motion for summary judgment. At the hearing on pending motions on June 22, 1984, this Court granted AIMS' motion to amend its pleadings to allege a conspiracy between Prime and its dealers. AIMS has based its Section 1 claims almost exclusively upon this theory, although it raised another theo-

ry in opposing Prime's motion for judgment on the pleadings.[3]

In *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court held that a Section 1 violation requires concerted action between the manufacturer and other distributors. Unilateral action of the manufacturer does not constitute a Section 1 violation. *See also United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) (Manufacturer may independently refuse to deal with distributors who sell below manufacturer's resale price). The *Monsanto* Court held that concerted action is not established merely by proof of a manufacturer's termination of a distributorship in response to complaints by other dealers. Rather, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" —— U.S. at ——, 104 S.Ct. at 1471, 79 L.Ed.2d at 785–86 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980)).

In the present case, there is a fact issue regarding whether Prime was pressured into adopting its policy against hardware only sales. AIMS has presented evidence that Jack Kelly spoke of pressure from other dealers to prevent sales to hardware brokers, that the value added provision arose out of negotiations with the dealer ad hoc committee, that the dealer negotiators had spoken to AIMS of the need to prevent sales to hardware brokers, that other dealers may have informed Prime of AIMS' sales, and that Prime pressured AIMS to desist. Although Prime has submitted affidavits denying all such allegations of concerted activity, AIMS has clearly raised a factual issue of conspiracy that is inappropriate for summary judgment disposition.

---

**3.** Aims defended its pleading by arguing that it could be supported by a theory of a conspiracy between Prime and AIMS itself, where Prime actively coerced AIMS into unwilling compliance with its demands. This theory is inadequate because AIMS' cooperation was unnecessary for the success of Prime's marketing arrangement. *See Barnosky Oils, Inc. v. Union Oil Co. of California*, 665 F.2d 74, 77–79 (6th Cir. 1981) (no section 1 conspiracy where plaintiff did not show defendant needed plaintiff's acquiescence).

AIMS has not rested merely on dealer complaints.

AIMS has argued that Prime's practices are *per se* illegal price fixing, boycotting, and market division. Prime has argued that its practices are not *per se* Section 1 violations, but practices which, analyzed under the rule of reason, are not unreasonably anticompetitive. In support of its price fixing argument, AIMS argues that the added value provision to which it was compelled to agree permits only the dealer who initially sold a computer system for Prime to sell add-on and upgrade hardware and equipment. This equipment, because of the compatibility of Prime's products, generally can be installed without reprogramming or other dealer services and is installed directly by Prime personnel. Moreover, upgrades do not ordinarily require new application software. The new amendment therefore locks in end users to deal only with the original dealer from whom the user purchased a system. AIMS argues that because this avoids price competition among dealers, it is *per se* unlawful concerted action to fix prices. Additionally, AIMS contends that the arrangement amounts to a boycott of discounters and a horizontal customer allocation among dealers, all *per se* violations of Section 1 of the Sherman Act.

Prime argues that the arrangement is a nonprice restriction which is judged under the rule of reason to determine whether the practice constitutes an unreasonable restraint of competition. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Prime argues under this standard that its practices are not unreasonable because they beneficially enhance interbrand competition. Specifically, Prime urges that allowing dealers to sell only complete systems and subsequent upgrades only to those same purchasers of complete systems allows Prime to penetrate markets it could not otherwise reach, to control the quality and reputation of the systems installed, and to prevent dealers from free-riding on Prime's marketing efforts.

Prime has not required that AIMS sell to end users at a specific price; it has reserved certain sales for itself and required end users who desire upgrades to deal only with their original Prime dealers. Prime contends that restricting "hardware only" sales encourages dealers to develop the market for users of complete computer systems, thus enhancing Prime's ability to compete with other brands of computers. This also limits intrabrand retail price competition among dealers and direct sales staff for add-on and upgrade equipment. Vigorous competition still remains among dealers in the market for complete computer systems.

It is well settled that nonprice vertical restrictions are evaluated with lower scrutiny than price restrictions, which are *per se* illegal. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51 n. 18, 97 S.Ct. 2549, 2558 n. 18, 53 L.Ed.2d 568 (1977). While the restrictions in this case reduce intrabrand price competition and undoubtedly affect retail prices, they do not amount to retail price maintenance, which is illegal *per se* under Section 1. Preventing "hardware only" sales by dealers enhances Prime's access to end users of complete computer systems by ensuring that Prime dealers focus their sales on the full product market Prime employs them to reach. Hardware only sales diverted some dealers' attention from full-product sales, for which dealers receive discounts and training from Prime, and interfered with the sales efforts of Prime's direct sales force. Broad discounting by dealers could lead to dealers becoming clearinghouses for Prime equipment rather than maintainers of showrooms and promoters of full computer systems with Prime equipment and dealer application programs. This would weaken Prime's ability to compete interbrand.

Prime has also asserted interests in quality control and in avoiding the free-riding effect of having discounting dealers benefit from other dealers' and Prime's promotion service and marketing. AIMS contends this interest is illusory as far as service and

quality control are concerned because Prime's field service personnel maintain the equipment regardless of who made the sale. Moreover, AIMS argues, dealer service under Prime's new system only becomes important *before* sales of systems; there is no incentive for the original dealers to provide services after the original sale because they will have the add-on and upgrade service on that account regardless of their subsequent efforts. AIMS also dismisses Prime's quality control interest as "makeweight." Because Prime routinely authorized the application software to be sold with its systems, and maintains all equipment itself, AIMS argues that Prime has no legitimate concern that end users will be supplied with quality control.

Although many of these contentions are meritorious and should be considered by a factfinder at trial evaluating the reasonableness of Prime's restrictions, Prime has established that its measures are not price maintenance treated always as *per se* illegal. Discounting Prime hardware and selling in bulk is a form of free-riding on other dealers who deal only in complete systems and promote the systems and maintain exhibits as required by their dealer agreements. Moreover, Prime's ability to control approval of application software to be sold with equipment does foster quality by ensuring compatibility with the computer system. Because the measures enhance *interbrand competition in this way and fos*ter penetration of the market for users of complete systems, the added value provision is not *per se* illegal price maintenance. Like many other nonprice restraints, it has a price effect. Because it allows Prime to compete more effectively with its vigorous competitors, it is not without redeeming qualities.

In *Davis-Watkins Co. v. Service Merchandise*, 500 F.Supp. 1244 (M.D.Tenn. 1980), *aff'd*, 686 F.2d 1190, 1196–97 (6th Cir.1982), *cert. denied sub nom., Service Merchandise Co. v. Amana Refrigeration, Inc.*, — U.S. ——, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), the Sixth Circuit held that vertical restraints, actions originating as unilateral action from the manufacturer, should generally be analyzed under the rule of reason. To determine whether restrictions are imposed vertically or horizontally, the court held that one must examine the effect and purpose of the restrictions. Because the court found the challenged restrictions were in the manufacturer's own interest and consistent with its market strategy, and because it found insufficient evidence of coercion by dealers to act against the manufacturer's own interest, the court upheld this Court's summary judgment finding that the market allocations in question did not amount to a horizontal group boycott, *per se* unlawful under Section 1.

The *Davis-Watkins* court relied substantially on *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The Court in *Sylvania* held that vertical restraints limiting the number of franchises authorized by a manufacturer must be analyzed under the rule of reason. Observing that the *per se* rule applies where practices have a destructive effect on competition without redeeming qualities, *id.* at 50, 97 S.Ct. 2549 at 2557, 53 L.Ed.2d 568, the Court emphasized that vertical restraints often benefit competition. Vertical restrictions, the Court held, "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." *Id.* at 54, 97 S.Ct. 2549 at 2560, 53 L.Ed.2d 568. The Court stressed that limitations on distributors of a manufacturer's products induce retailers to promote the products and prevent the "free rider" effect of retailers providing products without services. *Id.* at 55, 97 S.Ct. 2549 at 2560, 53 L.Ed.2d 568. Although the Court noted that some vertical restrictions might justify *per se* prohibition, it held that departures from the rule of reason must be based on demonstrated economic effect. *Id.* at 58, 97 S.Ct. 2549 at 2561, 53 L.Ed.2d 568. Thus, the Court established the rule of reason as the general rule for treatment of vertical restraints under Section 1.

■ As in *Davis-Watkins*, the evidence in this case does not establish a *per se*

violation of Section 1. The flurry of papers and internal Prime memoranda indicate clearly that the prohibitions of "hardware only" sales originated with Prime. Although there is sufficient evidence of concerted activity to present the Section 1 issue to a jury, AIMS has not presented the evidence required to indicate horizontal restraints, originating with dealers, to justify departure from the rule of reason. There is no evidence to establish dealer coercion causing Prime "to act otherwise than consistent with its marketing strategy." *Davis-Watkins*, 686 F.2d at 1199. Again, as in *Davis-Watkins*, evidence of complaints from dealers to the manufacturer alone would be insufficient to establish a horizontal restraint. *Id.* (citations omitted), 500 F.Supp. at 1249.

The *Davis-Watkins* court supported its decision to apply the rule of reason with findings of potential benefits to interbrand competition in the form of attracting aggressive retailers and inducing them to promote the products actively, eliminating the free rider effect, creating an efficient market distribution system, and maintaining control over safety and quality of the product. *Id.* at 1200–01 (quoting *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir.1981)). Finding these benefits, the court held the economic conditions that justify the *per se* rule were not present and therefore it did not apply. *Id.* at 1201. As found above in discussing whether the amendment is a price restraint, Prime's distribution system fosters interbrand competition in similar ways. It is appropriate for rule of reason analysis.

■ Prime has moved for summary judgment on the rule of reason issue, claiming that its actions do not have an unreasonable anticompetitive effect with reference to the overall effect on competition among all competitors in the relevant market. This motion must be denied. The data on Prime's ability to affect competition is inconclusive, but it is not insubstan-

tial as a matter of law. Nor is it clear the Prime's policies have no effect on competition through retail prices. A trial on the merits is necessary to determine the reasonableness of Prime's system of distribution. *See Davis-Watkins*, 500 F.Supp. at 1247.

### SHERMAN ACT SECTION 2

■ AIMS has alleged that Prime took anticompetitive actions to monopolize trade and commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The issues under this cause of action revolve around Prime's market share and the definition of the relevant market. AIMS has not phrased its claim as one for attempted monopolization. However, even if it is considered as such,[4] Aims would have to demonstrate that Prime will achieve a substantial market share through its "hardware-only" restriction. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980) (affirming summary judgment holding that plaintiff did not show that defendant with market share of 48 to 33 percent had a dangerous probability of success in attempted monopolization). *See also White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 507 (6th Cir.1983) (attempt to monopolize requires evaluation of market power).

■ There is conflicting and inconclusive evidence regarding both market definition and market share. Although at trial, the plaintiff has the burden to show market definition, for summary judgment consideration, Prime, as movant, has the burden of establishing the issue in its own favor. *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 68 (2d Cir.1984). AIMS, asserting that Prime's market share is not insufficient for a Section 2 cause of action as a matter of law, has produced data demonstrating that Prime has focused on specified market segments. AIMS seeks to demonstrate that Prime's market

---

**4.** The Section 2 offense of monopolization requires, if anything, an even greater showing of market power than does attempted monopoliza-

tion. *See generally United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

share in the area of "32 bit superminicomputers" is substantial and that Prime "has monopoly or near monopoly power in the market segments which it has pursued." Memorandum In Opposition to Defendant's Motion for Summary Judgment at 25.

AIMS produced evidence showing that the "32 bit superminicomputer" systems and the comparable mainframe systems, both of which perform distributed data processing functions,[5] are not reasonable substitutes for one another. (Schaider Declaration ¶¶ 5, 6). Mainframe systems perform functions in a series, while superminicomputers allow for scattered workstations and tasks performed out of sequence. (*Id.* ¶ 6). In support of his conclusion that the data processing industry regards "32 bit superminicomputers" as a separate market, AIMS' expert relies on an article printed in the June 7, 1984, issue of the *Wall Street Journal.* (Schaider Declaration Exhibit 1). Excluding mainframe systems in his market share calculations, Schaider produces market share data showing Prime had a 59.7 percent market share in 1979, 54.2 percent in 1980, and 45.8 percent in 1981. (*Id.* ¶ 7, Exhibit 2). The *Wall Street Journal* article stated that Prime's market share dropped from 33 percent in 1980 to 16 percent in 1983. AIMS has also produced a confidential Prime memorandum dated June 12, 1984, in response to the *Wall Street Journal* article. Included is a letter from the data company that supplied the figures for the article. The company explains that the 1983 figure should have ranged from 16 to 18 percent, and that the article should have based its figures on the dollar value of Prime systems rather than the unit shipment market share. This could have increased market share figures for Prime 3 to 7 percentage points. This would result in figures of a maximum of 40 percent market share in 1980 declining to a maximum market share of 25 percent in 1983. The data company also stated that

Prime's market share erosion was halted in 1983.

■ Prime has produced evidence from another market data firm indicating that there is no separate market for "superminicomputers" and that other systems are reasonable substitutes. (Bushee Affidavit ¶ 3). Bushee concludes that Prime's market share has never exceeded 2.2. percent of the minicomputer market. Even considering a separate market for "superminicomputers," Bushee concludes Prime's market share did not exceed 3.7 percent of that market. (*Id.*). Because Prime is the party moving for summary judgment and there is a genuine, unreconciled dispute regarding market share, the evidence must be considered in the light most favorable to AIMS. Therefore, the Court will examine Prime's market share within the market segments identified by AIMS in Prime's advertising and planning documents.[6]

■ In determining whether Prime had monopoly power, the Court must examine the strength of competition, the probable development of the industry, customer demand, and the percentage of market share of the defendant. *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.,* 730 F.2d 64, 69 (2d Cir.1984). To determine whether Prime is liable for attempted monopolization under Section 2, the Court must determine whether Prime has a dangerous probability of success. This requires a showing that the defendant possesses "market strength that approaches monopoly power—the ability to control prices and exclude competition." *White & White, Inc. v. American Hospital Supply Corp.,* 723 F.2d 495, 507 (6th Cir.1983) (quoting *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 826 (6th Cir.1982)).

This Court holds that AIMS Section 2 claim must be dismissed. It is clear and

---

**5.** According to AIMS, this is one of the submarket areas on which Prime has focused.

**6.** The market for add-on and upgrade equipment on its own cannot be considered a relevant market. *See, e.g., Telex Corp. v. IBM Corp.,* 510 F.2d 894, 914–19 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (compatible computer peripherals do not constitute a relevant market).

beyond dispute that the computer industry is developing rapidly and that competition is very intense. This is reflected in the changing market share figures in the Bushee affidavit, the changing hardware and equipment available, the rapidly changing marketing strategies, the frequent changes of personnel between companies, and the large number of competing companies within the industry. (*See e.g.* Kaufman Aff. Exhibit 3, Plaintiff's Appendix 78). AIMS itself has acknowledged the rapid development of the industry in conjunction with its contract claims.

■■■ Where there is strong competition in a rapidly developing industry, the Sixth Circuit concludes that a market share of roughly 25 percent cannot present a dangerous probability of monopoly power. *White & White*, 723 F.2d at 508; *Richter Concrete*, 691 F.2d at 826 (30 percent share of market insufficient). *See also Lektro-Vend Corp. v. Vendo Corp.*, 660 F.2d 255, 271 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (and citations); *United States v. Empire Gas Corp.*, 537 F.2d 296, 305–07 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Terry's Floor Fashions v. Burlington Industries*, 568 F.Supp. 205, 214 (E.D.N.C.1983).[7]

■■■ Prime's maximum market share of 25 percent in 1983 had stabilized from the year before. Market figures were therefore the same in 1982 when the challenged practices occurred. Competition in the field shows no signs of abating. It is also significant in determining Prime's ability to monopolize that the actions challenged as antitrust denied products to dealers only for certain types of sales. Prime did not close off all of its products to all dealers. Thus, AIMS has demonstrated no significant probability of monopolization.

## CONTRACT CLAIMS

AIMS has raised several contract claims against Prime. One of these concerns Prime's refusal to sell any model 9950 systems to independent dealers such as AIMS. Prime authorized sales of the model 9950 only through direct sales, and through the "Authorized Distributor Program." (Cargile Aff. Exhibit 8, Plaintiff's Appendix 23). AIMS claims that in negotiations for the dealer agreement, Prime gave assurances that its entire line of products would be available. AIMS also contends that Prime's failure to make all of its products available is contrary to Prime's good faith obligations and its obligation not to destroy or injure AIMS' contract rights. *See Uproar Co. v. NBC*, 81 F.2d 373, 376–77 (1st Cir.) (citations omitted), *cert. denied*, 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936).[8]

■■■ There is a genuine dispute regarding whether Prime gave assurances that the entire line of products would be available. President Cargile of AIMS asserts that Prime's representative did give these assurances and stated that assurances that newly developed products would be available were "of central importance because of the rapid advances in computer technology." (Cargile Aff. ¶ 5, Plaintiff's Appendix 3). Prime's representative at the time denies this, claiming he told Cargile only the hardware Prime believed necessary for marketing application software would be available. (Finney Aff. ¶¶ 11, 12; *see also* Davidson Aff. ¶ 14). The initial dealer agreement and its amendment never provided that all compatible hardware would be available, nor was all compatible hardware included on the original schedule. (Finney Aff. ¶ 11; Horne Aff. ¶ 3). It provided the dealer with discretion to add or delete hardware. Moreover, because the dealer agreement provides an integration clause, contemporaneous oral statements would constitute inadmissible parole evidence. (*See* Kirby Aff. Exhibit A P.23 ¶ 24.1) (integration clause)).

7. Prime's market figures, however, are significant enough for AIMS' rule of reason case under Section 1.

8. The dealer agreement provides that it shall be construed under the laws of Massachusetts.

■ AIMS' contention regarding sales of the 9950 must therefore be dismissed. Prime has demonstrated that the hardware presently available to AIMS is not obsolete and insubstantial. Prime hardware available for sale to AIMS accounts for 70 percent of Prime's hardware sales in the first quarter of 1984. (Horne Aff. ¶ 4). Moreover, AIMS has been treated no differently from other dealers. The 9950 system is not available to any dealer. If AIMS had not declined to become an Authorized Distributor, it would have access to 9950 sales. AIMS has the same rights to hardware as all other dealers. The dealers have banded together to protect their rights before. AIMS is adequately protected from overreaching by paragraph 5.5 of the dealer agreement, which provides that Prime shall not use its powers to delete equipment to effect termination of the dealer. AIMS has not sought to invoke the protection of this provision.

■ AIMS' remaining contract claims stand on firmer ground. These claims involve Prime's compliance with the added value restriction. *See supra* footnote 2. The first claim involves Prime's rejection of AIMS' orders for computer systems because of the policy and the contract provision prohibiting "hardware-only" sales. AIMS claims that Prime rejected the orders without affording AIMS the opportunity to specify the application software or services being sold prior to or in conjunction with the hardware ordered. (*See* Cargile Supplemental Aff. ¶¶ 21–26; Plaintiff's Appendix 28–29). Prime asserts that Prime's rejection of orders was due to AIMS' refusal to specify its compliance with the dealer agreement. (*See* Kirby Aff. Ex. 3, Plaintiff's Appendix 148). As discussed *supra*, however, it is unclear whether Prime relied on the amendment in rejecting the earlier orders. AIMS subsequently specified application software to be sold along with Prime hardware. (*See* Cargile Aff. Exhibit 10, Plaintiff's Appendix 26). Prime requested further specifications on other orders. (Kaufman Aff. Exhibit 6, Plaintiff's Appendix 90). The issue of contract compliance on this issue is not clear enough for summary judgment disposition. Moreover, Prime's compliance with the provision of the new amendment may be relevant to the antitrust issues as well. Accordingly, Prime's motion for summary judgment on this issue is denied.

■ AIMS may also take to trial its claim that Prime unreasonably withheld authorization of application software to be sold along with Prime equipment. AIMS has argued that Prime's refusal to approve additional application software was contrary to Prime's contractual obligation not to withhold authorization of additional software unreasonably. (*See supra* footnote 2). Prime rejected AIMS' proposed additions to Schedule 1 approved application software because it was "reluctant to expand the relationship between the parties under present circumstances." (Kaufman Aff. Exhibit 6, Plaintiff's Appendix 90). Cargile of AIMS asserts that Prime never previously requested documentation or other formal testing for approval of application software. (Supplemental Cargile Aff. ¶ 26, Plaintiff's Appendix 29). There is conflicting evidence regarding whether Prime had standards for evaluating proposed application software for approval. (*Compare* Schaider Declaration ¶ 4 *with* Horne Aff. ¶¶ 5, 6). Therefore, this issue must proceed to trial.

## PRELIMINARY INJUNCTION

■ For the following reasons, AIMS' motion for a preliminary injunction is denied. In order to determine whether to grant a preliminary injunction pursuant to Fed.R.Civ.P. 56(c), the Court must evaluate (1) the merits of plaintiff's claim for ultimate relief; (2) the harm facing plaintiff if interim relief is denied; (3) the harm facing defendant or others if interim relief is granted; and (4) the public interest in granting or denying interim relief. *E.g., Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102–04 (6th Cir. 1982); *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 536–38 (6th Cir.1978), *cert. dismissed per stipulation,* 442 U.S.

925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *Mason County Medical Association v. Knebel*, 563 F.2d 256, 260–62 (6th Cir.1977). No single factor is determinative; all must be weighed equitably. *Roth*, 583 F.2d at 537–38. One of the considerations required is the probability that plaintiff will succeed on the merits. *Id.* (citations omitted). Additionally, plaintiff must demonstrate that in the absence of relief, plaintiff will be irreparably harmed. *Friendship Materials*, 679 F.2d at 103 (citations omitted) (injunctive action for antitrust violations).

█ AIMS seeks a preliminary injunction to forbid Prime from enforcing the "added value" provision of the dealer agreement and from refusing to sell its entire line of compatible equipment to AIMS for resale. AIMS asserts that would be irreparably harmed without preliminary relief, citing cases holding that loss of a product line constitutes irreparable injury to a full-line dealer such as AIMS. *See Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189, 196–97 (4th Cir.1977); *Bergen Drug Co., Inc. v. Parke, Davis & Co.*, 307 F.2d 725, 728 (3d Cir.1962). These cases do not apply here because they involved a manufacturer's refusal to supply its entire product line to a particular retailer, treatment which discriminated against that particular dealer. Here, Prime has not placed AIMS at a disadvantage to other dealers, for AIMS has access to the same equipment as other dealers. Moreover, Prime has not closed off its entire product line to all dealers, but only a portion of it. AIMS has not demonstrated that money damages would not adequately compensate its alleged loss of profits, nor that its business failure and entry into bankruptcy was caused by Prime's restrictions. Although AIMS argues that it will be unable to salvage its business without preliminary relief, plaintiff has not explained why other dealers in the same position have not been driven into bankruptcy. While preliminary relief would clearly aid AIMS reorganization, other equitable considerations require denial of the preliminary injunction.

█ AIMS insists that immediate action is necessary to protect its interests, yet it waited one and one-half years after cancellation of its orders to bring this action for an injunction. This delay belies AIMS' claim to irreparable harm. *See Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278, 280 (S.D.N.Y.1971) (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F.Supp. 618, 622 (S.D.N.Y.1959)). Moreover, injunctive relief would not preserve the status quo as much as it would expand AIMS' position under the contract. *See Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir.1975) (citations omitted) (purpose of preliminary injunction is to preserve status quo).

There are other reasons why the equities weigh against granting the injunction. Although Prime's viability would not be threatened by injunctive relief, its distribution system would be greatly disrupted. Its discount for sales of complete systems would be arguably misappropriated to allow a dealer to make large numbers of wholesale sales. AIMS has not demonstrated a sufficient likelihood of success to justify the harms that would result from the preliminary relief AIMS has requested. Nor would any public interest mandate granting the injunction.

## CONCLUSION

For the reasons discussed above, the Court concludes: AIMS' claim for violations of the Sherman Act, Section 1 will proceed under the rule of reason; AIMS' Section 2 claim is dismissed; AIMS' contract claims will proceed to trial as limited in this memorandum; and AIMS' motion for a preliminary injunction is denied. The state unfair trade practices claims will also proceed to trial because they are not appropriate for summary judgment disposition.